**DATA RACE, INC., Plaintiff,**

v.

**LUCENT TECHNOLOGIES, INC., Defendant.**

**No. CIV.A. SA98CA746PMA.**

United States District Court,
W.D. Texas,
San Antonio Division.

Oct. 29, 1999.

700

702

John N. McCamish, Jr., McCamish & Socks, P.C., San Antonio, TX, Floyd R. Nation, Arnold White & Durkee, Houston, TX, David D. Bahler, Arnold, White & Durkee, Austin, TX, Harold L. "Buddy" Socks, McCamish & Socks, P.C., San Antonio, TX, for Plaintiff.

Robert W. Wachsmuth, The Kleberg Law Firm, San Antonio, TX, Hubert W. Green, Jr., The Kleberg Law Firm, San Antonio, TX, Paul C. Saunders, Cravath, Swaine & Moore, New York, NY, Julie A. North, Cravath, Swaine & Moore, New York, NY, Christopher Steskal, Karin A. Guiduli, Cravath, Swaine & Moore, New York, NY, for Defendants.

## *FINDINGS OF FACT AND CONCLU-SIONS OF LAW AND MEMO-RANDUM OPINION*

MATHY, United States Magistrate Judge.

Pursuant to the consent of the parties filed on November 6, 1998,[1] in compliance with Fed.R.Civ.P. 52, 56 and 65, the Court enters the following Findings of Fact and Conclusions of Law and Memorandum Opinion in connection with the combined evidentiary hearing on plaintiff's motion for issuance of a preliminary injunction and claims construction hearing, which began on August 30, 1999 and concluded on September 17, 1999. As discussed below, this Order also decides other issues raised by defendant's motion for summary judgment and plaintiff's motion for partial summary judgment.

### I. *JURISDICTION*

The Court has jurisdiction over plaintiff's claims that defendant has infringed its patent, 28 U.S.C. §§ 1331, 1338(a) and 2201(a), and over defendant's counterclaim for declaratory judgment that plaintiff's patent is invalid and not infringed by defendant, 28 U.S.C. §§ 1338(a), 2201 and 2202. Venue is proper under 28 U.S.C. § 1400(b).

### II. *PROCEDURAL HISTORY*

This case concerns claims of alleged patent infringement. Data Race, Inc. ("plaintiff" or "Data Race") filed its original complaint and motion for issuance of a preliminary injunction on August 18, 1998 alleging that defendant Lucent Technologies, Inc. ("defendant" or "Lucent") has infringed one of its patents, United States Patent No. 5,764,639 (" '639 patent"); misappropriated confidential and proprietary information in breach of contract and theft of trade secrets; violated the Sherman Antitrust Act; and engaged in unfair competition.[2] Among other allegations, Data Race averred that Lucent Technologies' operation of Lucent's Internet Telephony Server for Enterprises ("ITS-E") with Lucent's Virtual Telephone application infringed the '639 patent used in plaintiff's competing product marketed under the name "Be There!"

On September 17, 1998 the Court set a September 25, 1998 hearing to address plaintiff's request for expedited discovery and defendant's request to stay the case pending arbitration. The September 17 Order also called upon plaintiff to file an advisory on or before September 22, 1999 to inform the Court whether it wished to proceed with an evidentiary hearing on its motion for preliminary injunction on September 25.[3] On September 21, 1998 defendant filed an advisory informing the Court that defendant had decided not to offer Virtual Telephone for general distribution and that no release date had been selected.[4] On September 22, 1998 plaintiff filed an advisory in which it withdrew its request for a preliminary injunction.[5] Therefore, the September 25, 1998 hearing did not address the issuance of a preliminary injunction.

Following the September 25 hearing, on October 2, 1998, the undersigned issued a report to the District Court recommending, *inter alia*, that plaintiff's motion for expedited discovery and defendant's motion for stay pending arbitration each be denied.[6] With specific respect to plaintiff's motion for preliminary injunction and in reference to plaintiff's advisories,[7] the undersigned recommended that the portion of the Complaint that had been construed as a motion for preliminary injunction be denied without prejudice to plaintiff "filing a separate motion for a preliminary injunction with a request for an evidentiary

1. Docket no. 41.

2. Docket no. 1.

3. Docket no. 14.

4. Docket no. 15.

5. Docket no. 17.

6. Docket no. 24.

7. Docket no. 17; docket no. 22 at 1 ("Plaintiff is not seeking a preliminary injunction at this time.").

hearing after it has obtained the preliminary discovery which it believes it is required to support its application."[8] On October 27, 1998 the District Court accepted that report.[9] That same day, plaintiff's first amended complaint, which asserted only claims of patent infringement, the "live" complaint at issue in this case, was filed.[10] Lucent had answered plaintiff's first amended complaint on October 19, 1998 asserting the defenses of non-infringement, invalidity (for anticipation and obviousness) and unenforceability (for inequitable conduct) and asserting a counterclaim for declaratory judgment of non-infringement and invalidity of the '639 patent.

On August 3, 1999 plaintiff filed its renewed motion for issuance of a preliminary injunction.[11] In sum, plaintiff argues that after plaintiffs' first request for preliminary injunction, Lucent shifted the Virtual Telephone application from the original hardware platform (the ITS–E server) to a different platform, the MultiMedia Communications Exchange ("MMCX") server, release 3.0, and decided to offer the Virtual Telephone for sale in conjunction with the new MMCX release 3.0 server. Plaintiff argues that the Virtual Telephone continues to infringe the '639 patent because the elements of the invention claimed in the '639 patent are included in the MMCX, release 3.0, with the Virtual Telephone application. Plaintiff requests a preliminary injunction to prevent Lucent from "mak-

ing, using, selling or offering to sell its . . . [MMCX] . . . server, release 3.0, which includes a Virtual Telephone application ("Virtual Telephone")."[12] Plaintiff asserts infringement of claims 1, 14 and 39 of the '639 patent.[13]

Lucent argues, in sum, that Data Race's request for a preliminary injunction should be denied for five reasons. First, Lucent argues that Virtual Telephone does not infringe the '639 patent. Second, Lucent argues that even if there is infringement, the MMCX server, including the concept and technology for the Virtual Telephone, was invented prior to the date plaintiff filed its patent application and, therefore, the '639 patent is invalid. Third, Lucent argues that the '639 patent is invalid under 35 U.S.C. § 102(a) and (e) because it was anticipated by the prior art and under 35 U.S.C. § 103 because, in light of the prior art, it would have been obvious to a person of ordinary skill in the art at the time of the claimed invention. Fourth, Lucent argues that the '639 patent is unenforceable due to plaintiff's inequitable conduct before the United States Patent and Trademark Office ("PTO"). Fifth, Lucent argues that plaintiff has failed to demonstrate irreparable harm because the harm plaintiff alleges is compensable in money.

Between August 30, 1999 and September 17, 1999, the Court held an evidentiary hearing on plaintiffs' motion for preliminary injunction.[14] Prior to the hearing, the

---

**8.** Docket no. 22 at 1.

**9.** Docket no. 34.

**10.** Docket no. 35.

**11.** Docket no. 64.

**12.** Docket no. 65 at 1.

**13.** Docket no. 65 at 1. Plaintiff asserted infringement of claims 1, 2, 4, 14, 17–25, 27, 28, 36–39, 41, 42, 44–47 and 50 in its "initial disclosure of asserted claims" (docket no. 48). Later, in its proposed claim construction statement, plaintiff asserted infringement of only claims 1, 14, 20, 39, 41, 45–47 and 50.

In its preliminary injunction brief and at the beginning of the evidentiary hearing, Data Race reserved its right to assert at trial any of the claims (1, 14, 20, 39, 41, 45–47 and 50) identified in its proposed claim construction statement. At the hearing, in connection with comments regarding possible merger of the preliminary injunction hearing with the permanent injunction, counsel for Data Race indicated that, other than damages, no additional evidence would be presented at the trial on the merits; therefore, plaintiff is asserting infringement of only claims 1, 14 and 39 in the case as a whole.

**14.** The Court accommodated each party's respective scheduling problems by recessing the hearing on September 2–3 and 13–15, 1999.

parties filed *Markman* briefs,[15] proposed claim construction statements,[16] a joint proposed claim construction statement,[17] and briefing on the requested preliminary injunction.[18] Prior to the hearing, the parties stipulated to the admission of most of the evidence. At the hearing, three witnesses testified for plaintiff: Dr. W.B. Barker and Kenneth L. Witt, two of the three inventors of the '639 patent,[19] and plaintiff's expert witness, Scott O. Bradner. Defendant called four witnesses: Bryan S. Katz, Alan J. Literati, Richard S. Vidil and defendant's expert, Dr. Stephen Weiss. At the close of defendant's case, plaintiff re-called Mr. Witt as a rebuttal witness.[20]

15. Docket nos. 60 and 68.

16. Docket nos. 60 (sealed exhibit) and 67.

17. Docket no. 76.

18. Docket nos. 65 and 73.

19. Plaintiff offered Mr. Witt as an expert witness in the field of telecommunications and data networking (Tr. 449). Defendant initially objected to Witt testifying as an expert, but agreed to allow Witt's testimony to proceed, upon clarification that Witt would not testify as an expert in claims construction and subject to "connecting up" in Bradner's testimony (Tr. 459–60). Witt has conceded he is not an expert in claims construction (Dx 97, Witt Depo. at 182–84, 204, 226, 299). Defendant interposed no renewed motion to strike Witt's testimony to argue that the testimony was not "connected up," and there has been no request for the Court to enter findings as to the appropriateness of any expert opinions offered by Witt. Defendant did object strenuously to Witt's rebuttal testimony, a matter addressed further below.

20. Plaintiff had earlier filed an unsworn summary of Mr. Bradner's expected rebuttal testimony (docket no. 65, ex. 1).

21. Docket nos. 84 and 85.

22. Because the Rule 52(c) motion relied on the Court consolidating under Rule 65(a)(2), the Court initially reserved judgment pending the outcome of the consolidation motion. The motion was not expressly denied in the Order denying consolidation (docket nos. 84 and 85). In closing argument, Lucent has asked for reconsideration of the consolidation in light of a motion for summary judgment on damages that it indicated it intended to file.

At the beginning of the hearing, Lucent made an oral motion pursuant to Fed. R.Civ.P. 65(a)(2) to consolidate the preliminary injunction hearing with the trial on the merits. Data Race opposed this motion on the ground that it had a right to a jury trial. The Court denied the motion to consolidate, ruling that Data Race had a right to jury trial if it could establish compensatory damages for its claim of infringement.[21] Two motions were carried with the case: defendant's oral motion for partial findings under Rule 52(c), Fed. R.Civ.P., made at the close of plaintiff's case-in-chief[22] and defendant's motion to strike the rebuttal testimony of Mr. Witt.[23]

Therefore, the Rule 52(c) motion remained pending.

23. Plaintiff re-called Mr. Witt to the stand in its rebuttal case to prove a conception date for the claimed invention prior to November 15, 1995, the date of the patent application. Lucent moved to strike the testimony, arguing that plaintiff knew long before the hearing that Lucent claimed to have a first invention, premised on the date of filing the application for the patent in suit, and that the uncorroborated testimony of an inventor is not sufficient to establish a conception date (Tr. 1561–64). The Court received the rebuttal testimony subject to the motion to strike. Witt's rebuttal testimony established that the earliest dated document in Data Race's files for the "Hogan project," that is, a virtual presence product, was June 19, 1995 (Px 145). A document already in evidence (Dx 111), reflected that the first meeting regarding the Hogan project occurred June 22, 1995. A document, obtained from the files of plaintiff's lawyer, purporting to show that plaintiff asked its lawyer to begin preparing a patent application for "Hogan" on June 9, 1995—the earliest dated reference to the Hogan project in Witt's rebuttal testimony. This document (Px 144) was not admitted into evidence for improper authentication.

Although the Court declines to strike Witt's rebuttal testimony in its entirety, the Court does *strike* and will not consider plaintiff's exhibits 144 through 150 and Witt's testimony regarding those exhibits on the ground that the exhibits were not properly authenticated by Witt's rebuttal testimony. Each of these documents is dated prior to September 13, 1995, the earliest date for which there was any arguable corroboration of Witt's testimony regarding the date of conception. Indeed, Data Race argues in post-hearing briefing

At the close of the evidence the Court extended the time for the parties to file motions for summary judgment until October 1, 1999; ordered the parties to file proposed findings of fact and conclusions of law on or before October 4, 1999; and called for responses to any motions for summary judgment to be filed on or before October 8, 1999.

The Court has now reviewed the parties' proposed findings of fact and conclusions of law,[24] Lucent's motion for summary judgment,[25] Data Race's motion for partial summary judgment[26] and the parties' responses thereto.[27] For the reasons stated in this Order, the Court concludes that Data Race has not established a claim for damages and, therefore, summary judgment in favor of Lucent on damages is appropriate. Accordingly, because Data Race is not entitled to a jury trial on its remaining claim for injunctive relief, the Court may decide the remaining issues on the merits. The Court concludes that Data Race has not met its burden of proof that it is entitled to issuance of a preliminary injunction. Although, in the preliminary injunction context, Data Race has met its burden of showing a reasonable likelihood that Lucent cannot produce clear and convincing evidence that the patent is invalid, Data Race has not estab-

lished reasonable likelihood that the MMCX, release 3.0 with Virtual Telephone infringes the '639 patent. The Court further concludes that there is no genuine issue of material fact regarding the issue of infringement or, in the alternative, that judgment on the issue of infringement should be entered in favor of defendant. The Court also concludes that Lucent has not presented sufficient evidence to render as "plainly evident" the invalidity of the patent in suit.

## III. ISSUES

1. Has plaintiff satisfied its burden of proving entitlement to a preliminary injunction to prevent defendant from making, using, selling and offering to sell its MMCX server, release 3.0, which includes a Virtual Telephone application during the pendency of this lawsuit?

2. Is there a genuine issue of material fact with respect to plaintiff's request for damages on its claim of infringement?

3. Is there a genuine issue of material fact with respect to the issue of infringement or, alternatively, may judgment be entered on the issue of infringement?

4. Are Lucent's defenses of invalidity and unenforceability "plainly evident"?

---

that "Data Race is entitled to an invention date as early as September 13, 1995" (docket no. 102 at 5 n.2), thereby conceding that it is no longer arguing that it is entitled to an invention date before September 13, 1995.

Lucent argues that the remaining documents referred to by Witt in his rebuttal testimony do not establish a conception date prior to November 15, 1999 or, specifically, a conception date as early as September 13, 1995. *Price v. Symsek*, 988 F.2d 1187 (Fed.Cir.1993) (uncorroborated testimony of an inventor is not sufficient to establish a conception date). The documents noted in the rebuttal testimony do not satisfy the required corroboration because they do not show disclosure to others; or that conception—the definite and permanent idea of the invention as it is to be applied in practice—was complete; or that every element of claims 1, 14 and 39 was conceived prior to the date the patent application was filed. *Kridl v. McCormick*, 105 F.3d 1446 (Fed.Cir.1997); *Burroughs Wellcome Co.*

*v. Barr Labs., Inc.*, 40 F.3d 1223 (Fed.Cir. 1994), *cert. denied*, 516 U.S. 1070, 116 S.Ct. 771, 133 L.Ed.2d 724 (1996). For example, a confidential Hogan product description dated September 15, 1995 (Dx 118) contains no express references to "routing" or "identification information" and, therefore, does not address every element of claims 1, 14 and 39. Therefore, and to the extent required by this Order, the Court finds that plaintiff is not entitled to a conception date earlier than November 15, 1995.

24. Docket nos. 103 and 111 (Lucent) and 104 and 114 (Data Race). Docket no. 111 superseded docket no. 103.

25. Docket no. 100 and 110. Docket no. 110 superseded docket no. 100.

26. Docket nos. 96 and 102.

27. Docket nos. 107, 108 and 113.

## IV. STANDARDS

### A. Preliminary Injunction Standards

■ District courts are authorized by statute to issue preliminary and permanent injunctions in patent cases.[28] Whether or not to grant a preliminary injunction against patent infringement involves substantive matters unique to patent law and, therefore, the law of the Court of Appeals for the Federal Circuit controls.[29] As to purely procedural aspects of injunctions, such as whether there has been compliance with Fed.R.Civ.P. 52(a) and 65, the law of the regional circuit, that is, the Fifth Circuit Court of Appeals, controls.[30]

■ According to the Federal Circuit, the test for entitlement to a preliminary injunction has four parts. A preliminary injunction to stop allegedly infringing acts may be granted only if the patentee demonstrates: "(1) a reasonable likelihood of success on the merits, (2) an irreparable harm, (3) the balance of hardships tipping in the patentee's favor, and (4) a tolerable effect on the public interest."[31] A preliminary injunction has been rightly described as a "drastic and extraordinary remedy" not to be routinely granted.[32] Equity requires that "the district court must weigh and measure each factor against the other factors and against the form and magni-

tude of the relief requested."[33] No factor or circumstance may be ignored. If the preliminary injunction is granted, the weakness of the showing regarding one factor may be overborne by the strength of the showing on the others. If a preliminary injunction is denied, the absence of an adequate showing on any one factor can be sufficient to justify the denial, depending on the weight assigned the other factors.[34] The Federal Circuit has stated that it is preferable that all factors be considered, but the first two factors—likelihood of success on the merits and irreparable harm—are central and "a movant cannot be granted a preliminary injunction without ... carr[ying] its burden on both factors."[35]

■ The matter of preliminary injunctive relief is committed to the sound discretion of the trial court.[36] The trial court's decision will be overturned only upon a showing that it made "a clear error of judgment in weighing relevant factors or exercised its discretion based upon an error of law or clearly erroneous factual findings."[37] Findings of fact are reviewed under the clearly erroneous standard and conclusions of law are reviewed *de novo*.[38]

■ In patent cases, the Court's analysis of movant's likelihood of success on the merits focuses on the infringement and

28. 35 U.S.C. § 283.

29. See *Reebok Int'l Ltd. v. J. Baker, Inc.*, 32 F.3d 1552, 1555 (Fed.Cir.1994).

30. *Xeta, Inc. v. Atex, Inc.*, 852 F.2d 1280 (Fed. Cir.1988).

31. *Sofamor Danek Group, Inc. v. DePuy–Motech, Inc.*, 74 F.3d 1216, 1219 (Fed.Cir.1996) (citing *Hybritech, Inc. v. Abbott Labs.*, 849 F.2d 1446, 1451 (Fed.Cir.1988). Docket no. 65 at 4; docket no. 73 at 12. The Federal Circuit has stated that the standards applied to preliminary injunctions are the same in patent cases as in other areas of the law. *High Tech Med. Instr., Inc. v. New Image Indus., Inc.*, 49 F.3d 1551 (Fed.Cir.1995).

32. *Intel Corp. v. ULSI Sys. Tech., Inc.*, 995 F.2d 1566, 1568 (Fed.Cir.1993),*cert. denied*, 510 U.S. 1092, 114 S.Ct. 923, 127 L.Ed.2d 216 (1994).

33. *Hybritech, Inc.*, 849 F.2d at 1451. *See also Intel Corp.*, 995 F.2d at 1568 (citation omitted); *Illinois Tool Works, Inc. v. Grip–Pak, Inc.*, 906 F.2d 679, 681, 683 (Fed.Cir.1990).

34. *Chrysler Motors Corp. v. Auto Body Panels of Ohio, Inc.*, 908 F.2d 951 (Fed.Cir.1990).

35. *Reebok, Int'l Ltd.*, 32 F.3d at 1556.

36. *Novo Nordisk of North Am., Inc. v. Genentech, Inc.*, 77 F.3d 1364, 1367 (Fed.Cir.1996).

37. *Id.; see also, e.g., Oakley, Inc. v. International Tropic–Cal, Inc.*, 923 F.2d 167 (Fed.Cir. 1991); *Atari Games Corp. v. Nintendo of Am., Inc.*, 897 F.2d 1572 (Fed.Cir.1990); *Intel Corp.*, 995 F.2d at 1566.

38. *Black and Decker, Inc. v. Hoover Serv. Center*, 886 F.2d 1285, 1290 (Fed.Cir.1989).

validity of the asserted patent claims.[39] An infringement analysis consists of two steps. First, the court addresses, as a matter of law, the correct scope of the claims. Second, the court compares the properly construed claims to the accused device in order to determine, as a matter of fact, whether all claim limitations are present, either literally or by a substantial equivalent, in the accused device.[40]

## B. Claim Construction

### 1. Timing

Claim construction is a matter for the Court.[41] The *Markman* decision established a court's obligation to instruct the jury on the meaning of words used in a claim.[42] It is not necessary for a court to construe definitively the patent claims when ruling on a motion for preliminary injunction.[43] Nevertheless, in this case, given the timing of the filing of the motion for preliminary injunction in the context of the filing of claim construction statements and briefs, and given plaintiff's representations that there are no non-damage related issues which were not presented in evi-

dence at the preliminary injunction hearing,[44] the Court concludes it is appropriate at this time to construe the disputed terms in claims 1, 14 and 39 of the '639 patent even apart from its disposition of summary judgment issues.[45] Indeed, the parties' arguments to the Court anticipate that the Court will construe claims 1, 14 and 39 at this time.

### 2. Priority of Evidence

■■■ Claims are construed from the vantage point of a person of ordinary skill in the art at the time of the invention.[46] In construing a claim, a court looks first to the intrinsic evidence of record, namely, the language of the claim, the specification, and the prosecution history.[47] The claim language itself defines the scope of the claim and "a construing court does not accord the specification, prosecution history, and other relevant evidence the same weight as the claims themselves, but consults these sources to give the necessary context to the claim language." [48] In its discretion, the court may also look at extrinsic evidence: testimony from inventors and expert witnesses, dictionary definitions

**39.** *Roper Corp. v. Litton Systems, Inc.*, 757 F.2d 1266, 1270 (Fed.Cir.1985).

**40.** *Johnson Worldwide Associates, Inc. v. Zebco Corp.*, 175 F.3d 985, 988 (Fed.Cir.1999).

**41.** *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed.Cir.1995)(en banc),*aff'd* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996).

**42.** *Elf Atochem v. Libbey–Owens Ford Co.*, 894 F.Supp. 844, 850 (D.Del.1995)

**43.** *International Communication Materials, Inc. v. Ricoh Co. Ltd.*, 108 F.3d 316, 318–19 (Fed.Cir.1997).

**44.** *Genentech, Inc. v. Novo Nordisk*, 935 F.Supp. 260, 264–65 (S.D.N.Y.1996), *rev'd*, 77 F.3d 1364 (Fed.Cir.1996) (Federal Circuit provided for early claim construction regarding motion for temporary restraining order). *See also Boehringer Ingelheim Animal Health, Inc. v. Schering–Plough Corp.*, 1998 WL 271764, at *3 (D.N.J. Apr.27, 1998) (District Court conclusively interpreted claim language at the same time as preliminary injunction hearing).

**45.** *See e.g., Loral Fairchild Corp. v. Victor Co. of Japan, Ltd.*, 911 F.Supp. 76, 79 (E.D.N.Y. 1996) ("The meaning of claim terms is the central issue of patent litigation. With most aspects of the trial hinging on this determination—now strictly a question of law for the court—a conscientious court will generally endeavor to make this ruling before trial.") (two day evidentiary hearing); *Neles–Jamesbury, Inc. v. Fisher Controls International, Inc.*, 989 F.Supp. 393 (D.Mass.1998) (three day hearing); *Comark Communications, Inc. v. Harris Corp.*, 1997 WL 87260 at *1 (E.D.Pa. Feb.24, 1997)(two day evidentiary hearing); *Elf Atochem*, 894 F.Supp. 844 (two day evidentiary hearing).

**46.** *Markman*, 52 F.3d at 986.

**47.** *Insituform Tech., Inc. v. Cat Contracting, Inc.*, 99 F.3d 1098, 1105 (Fed.Cir.1996).

**48.** *Eastman Kodak Co. v. Goodyear Tire & Rubber Co.*, 114 F.3d 1547, 1552 (Fed.Cir. 1997).

and treatises.[49] Although extrinsic evidence may be considered if needed to assist the court in understanding the technology at issue or in determining the meaning or scope of technical terms in a claim,[50] reliance on any extrinsic evidence is improper where the public record, that is, the claims, specification, and file history, unambiguously defines the scope of the claims.[51] Competitors have the right to look at the public record and attempt to "invent or design around" a claimed invention.[52] That right would be hollow if expert testimony can alter that record. Expert testimony, or other extrinsic evidence, including prior art, will be used only to aid the Court in understanding the claim, not to broaden the scope of the patent or to contradict the claim language, the specification or the prosecution history.[53]

**49.** *Markman*, 116 S.Ct. at 1396.

**50.** *Hoechst Celanese Corp. v. BP Chemicals, Ltd.*, 78 F.3d 1575, 1579 (Fed.Cir.), *cert. denied*, 519 U.S. 911, 117 S.Ct. 275, 136 L.Ed.2d 198 (1996). *See also Endress+Hauser, Inc. v. Hawk Measurement Systems Pty., Ltd.*, 122 F.3d 1040, 1042 (Fed.Cir.1997) (district court's interpretation of means-plus-function claim upheld: "[A]s we made abundantly clear in *Markman*, the trial court has wide latitude in the kinds of aids, including testimony of witnesses, employed to assist in the job of claim interpretation as a matter of law."); *Fromson v. Anitec Printing Plates, Inc.*, 132 F.3d 1437, 1442–45 (Fed.Cir.1997) (Federal Circuit upheld district court's claim interpretation based on intrinsic evidence and expert testimony: "Although *Markman* presents a useful general rule, it is adaptable to the needs of a particular case. In this case technical experts not only aided the court's understanding of technology, but also provided evidence material to the interpretation of the claims.")

**51.** *Trilogy Communications v. Times Fiber Communications*, 109 F.3d 739, 742, 744 (Fed.Cir.1997) (in construing claims the court should look to the claims language, the specification, the prosecution history, and extrinsic evidence only if necessary); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir.1996).

**52.** *Id.*

**53.** 90 F.3d at 1584–85; *Bell and Howell Document Management Products Co. v. Altek Systems*, 132 F.3d 701, 707 (Fed.Cir.1997).

It is well established that "claims must be interpreted and given the same meaning for purposes of both validity and infringement analyses."[54] *Markman* has led some courts to decline to consider prior art in interpreting claim language, reserving all such issues for the separate inquiry into validity.[55]

In this case, the Court looks to intrinsic evidence—the patent itself, including the claims, the specification and prosecution history—in defining the disputed claims. The claims define the scope of the invention.[56] The Court has accorded the disputed terms their plain and customary meaning in the relevant art,[57] unless it is clear from the specification and the prosecution history that the inventors accords the term an alternate meaning.[58]

**54.** *Kegel Co., Inc. v. AMF Bowling, Inc.*, 127 F.3d 1420, 1429 (Fed.Cir.1997).

**55.** *See Elf Atochem*, 894 F.Supp. at 859–60 (court declined to review prior art during claim construction, in order to avoid interpreting the prior art as a matter of law); *Haney v. Timesavers, Inc.*, 900 F.Supp. 1375, 1376–77 (D.Or.1995) (if prior art diminishes or varies claim language the certainly that patent statutes provide to the public would be destroyed; prior art is relevant to validity, a jury question, and not claim construction); *Stairmaster Sports/Med. Prods., Inc v. Groupe Procycle, Inc.*, 1998 WL 290296 at *2 n. 5 (D.Del. May 20, 1998) (court refuses to entertain issues of invalidity, noting that the Federal Circuit "has consistently rejected this approach to claim construction and continues to draw a line between claim construction issues and issues of infringement and validity.").

**56.** *Warner–Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 28–30, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997) (claims define the invention); *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir.1998) (claim analysis "begins and ends in all cases with the actual words of the claim").

**57.** *Johnson Worldwide Assocs., Inc.*, 175 F.3d at 988.

**58.** *Hoechst Celanese Corp.*, 78 F.3d at 1578.

A patentee may be his own lexicographer if the special definition of the term is clearly stated in the specification or prosecution history or when the specification defines a term by implication.[59] Thus, the Court has reviewed the specification, which may act as a "dictionary," either expressly or by implication. The portions of the prosecution history in evidence also been reviewed and considered.[60] The Court gives only limited consideration of "extrinsic" evidence, as noted expressly herein, such as dictionaries or expert witness testimony, to explain the terms of art or to address the parties' contentions about the claims, but not to "vary or contradict the claim language" or to "contradict the import of other parts of the specification."[61]

▆▆▆ There is presumed to be "a difference in meaning and scope when different words or phrases are used in separate claims."[62] There is a presumption against construing claims as being so similar as to "make a claim superfluous."[63]

▆▆▆ Although the Federal Circuit has held that claims should be read in view of the specification,[64] the Court repeatedly has cautioned against limiting the scope of a claim to the preferred embodiment or specific examples disclosed in the specification.[65] Claims and interpretation of the prosecution history is undertaken to sustain the validity of the claims, if possible, short of actually redrafting the claims.[66] "The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction."[67] The figures in the '639 patent may be considered "in the same manner and with the same limitations as the specification."[68]

### C. Summary Judgment Standards

The applicable standard in deciding a motion for summary judgment is set forth in Fed. R.Civ.P. 56, which provides in pertinent part as follows:

> the judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.[69]

Mere allegations of a factual dispute between the parties will not defeat an otherwise proper motion for summary judgment. Rule 56 requires that there be no genuine issue of material fact.[70] In an employment discrimination case, the Court focuses on whether a genuine issue of material fact exists as to whether the defendant intentionally discriminated against the plaintiff.[71] A fact is material if it

59. *Vitronics Corp.*, 90 F.3d at 1582.

60. *Id.*

61. *Vitronics Corp.*, 90 F.3d at 1584.

62. *United States v. Telectronics, Inc.*, 857 F.2d 778, 783 (Fed.Cir.1988).

63. *Id.*

64. *Hoechst Celanese Corp.*, 78 F.3d at 1582.

65. *See e.g., Ekchian v. Home Depot, Inc.*, 104 F.3d 1299, 1303 (Fed.Cir.1997); *Intervet America, Inc. v. Kee-Vet Laboratories, Inc.*, 887 F.2d 1050, 1053 (Fed.Cir.1989) ("[L]imitations appearing in the specification will not be read into claims, and . . . interpreting what is meant by a word in a claim 'is not to be confused with adding an extraneous limitation appearing in the specification, which is improper.' " (citation omitted)).

66. *Eastman Kodak Co.*, 114 F.3d at 1547.

67. *Renishaw PLC*, 158 F.3d at 1250.

68. *Autogiro Co. v. United States*, 181 Ct.Cl. 55, 384 F.2d 391, 398 (Ct.Cl.1967).

69. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

70. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

71. *See LaPierre v. Benson Nissan, Inc.*, 86 F.3d 444, 447 (5th Cir.1996)(citing *Armstrong v. City of Dallas*, 997 F.2d 62, 65–66 (5th Cir.1993)).

might affect the outcome of the lawsuit under the governing law.[72] A dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.[73] Therefore, summary judgment is proper if, under governing laws, there is only one reasonable conclusion as to the verdict; if reasonable finders of fact could resolve a factual issue in favor of either party, summary judgment should not be granted.[74]

The movant on a summary judgment motion, in this case bears the initial burden of providing the court with a legal basis for its motion and identifying those portions of the record which it alleges demonstrate the absence of a genuine issue of material fact.[75] The burden then shifts to the party opposing the motion to present affirmative evidence in order to defeat a properly supported motion for summary judgment.[76] All evidence and inferences drawn from that evidence must be viewed in the light most favorable to the party resisting the motion for summary judgment.[77] Thus, summary judgment motions permit the Court to resolve lawsuits without the necessity of trials if there is no genuine dispute as to any material facts and the moving party is entitled to judgment as a matter of law.[78]

When affidavits are used to support or oppose a motion for summary judgment they "shall be made on personal knowledge, shall set forth facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."[79] Affidavits that are not based on personal knowledge or that are based merely on information and belief do not satisfy the requirements of Rule 56(e), and those portions of an affidavit that do not comply with Rule 56(e) are not entitled to any weight and cannot be considered in deciding a motion for summary judgment.[80] Neither shall conclusory affidavits suffice to create or negate a genuine issue of fact.[81]

## V. ANALYSIS

With the foregoing principles on claim construction in mind, the Court makes the following background findings regarding the '639 patent and Lucent's accused device, and, thereafter, the disputed claim elements in claims 1, 14 and 39 of the '639 patent.

### A. The Claimed Invention: The '639 Patent

Data Race is the holder of U.S. Patent No. 5,764,639 (the " '639 patent"), entitled, "System and Method for Providing a Remote User With a Virtual Presence To An Office." The '639 patent issued on June 9, 1998 based upon an application filed on November 15, 1995 and is generally directed to a system and method for enabling a

72. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248, 106 S.Ct. 2505; *Thomas v. LTV Corp.,* 39 F.3d 611, 616 (5th Cir.1994).

73. *Id.* at 248, 106 S.Ct. 2505; *Wise v. E.I. DuPont De Nemours & Co.,* 58 F.3d 193, 195 (5th Cir.1995).

74. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 249, 106 S.Ct. 2505.

75. *Celotex Corp. v. Catrett,* 477 U.S. at 323, 106 S.Ct. 2548.

76. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 257, 106 S.Ct. 2505.

77. *Hibernia Nat'l Bank v. Carner,* 997 F.2d 94, 97 (5th Cir.1993).

78. *Fields v. City of South Houston, Texas,* 922 F.2d 1183, 1187 (5th Cir.1991).

79. Fed.R.Civ.P. 56(e); *Beijing Metals & Minerals Import/Export Corp. v. American Bus. Center, Inc.,* 993 F.2d 1178, 1182 (5th Cir. 1993).

80. *Richardson v. Oldham,* 12 F.3d 1373, 1378–79 (5th Cir.1994).

81. See *Travelers Ins. Co., v. Liljeberg Enterprises, Inc.,* 7 F.3d 1203, 1207 (5th Cir.1993); *Salas v. Carpenter,* 980 F.2d 299, 305 (5th Cir.1992).

remote user to maintain a "virtual presence" at a corporate office.

Data Race claims infringement of three claims of the '639 patent: claims 1, 14 and 39. The following is a summary of the key elements of the claimed invention described in those claims. The commercial embodiment of the claimed invention is a product called "Be There!"

### Claim 1

Claim 1 is an apparatus claim that describes a system that provides a "remote user," which included a telecommuter, road warrior, branch office or remote small office with a "virtual presence" at the corporate office.[82] According to the patent, "virtual presence" means a remote user's ability to send and receive voice or data communications to and from the corporate office just as if the user were physically located in the corporate office. Thus, the remote user's telephone mirrors the telephone the user has at the corporate office and provides the remote user with the same functions as the office private branch exchange ("PBX"), such as conference call, call forwarding and call transfer. The remote user also can access data applications on the office local area network ("LAN") just as if the remote user were located at the corporate office.[83]

The system described in claim 1 includes a user communications device that is "adapted for coupling to a transmission media" which is defined to include the PBX, asynchronous transfer mode ("ATM") networks, T1 lines and other types of transmission media, to include a normal telephone line or an Integrated Services Digital Network ("ISDN") line (used for digital data and voice communications).[84]

The system described in claim 1 also includes a "virtual presence server" ("VPS") "located at the corporate office" with "one or more connections for coupling to a telephony server and a local area network" and "one or more connections for coupling to transmission media."[85] The VPS is installed in the corporate office and connected to the "transmission media" (such as the PSTN), the office telephony server (such as the PBX) and the office LAN.[86] The VPS allows a remote user to establish a "virtual presence" when the remote user dials into the VPS and establishes a connection over the "transmission media" with the telephony server and the LAN.[87]

Claim 1 provides that the communications device (such as a personal computer) of the remote user, after connecting to the VPS through "transmission media," transmits "identification information" through the "transmission media" to the VPS.[88]

The VPS routes communications received by either the LAN or the telephony server "which are intended for the remote user of said user communication device" to the remote user over the "transmission media."[89]

### Claim 14

Claim 14 is a dependent claim of claim 1 and, therefore, incorporates the elements of claim 1 and adds some additional elements.

Under claim 14, the "user communications device transmits communications including address information of said user communications device where said user communications device can be contacted."[90] The address information is typically the telephone number of the remote user.[91] Under claim 14, the VPS uses the

---

82. '639 patent, col. 25 and col. 5.

83. '639 patent, column 2.

84. '639 patent, col. 25 and col. 4.

85. '639 patent, col. 25.

86. '639 patent, figures 1 and 2 and col. 25.

87. '639 patent, col. 2.

88. '639 patent, cols. 18, 25, 26, 28, 34 and figures 12 and 13.

89. '639 patent, col. 25.

90. '639 patent, col. 27.

91. '639 patent, col. 18.

"address information" to "route" communications from the PBX or the LAN to the remote user over the "transmission media."[92]

*Claim 39*

Claim 39 is a method claim. Claim 39 provides a method for providing a "virtual presence at a corporate office, wherein the corporate office includes a telephony server and a local area network, wherein the corporate office further includes a[VPS] which routes communications between the corporate office and the user communications device."[93]

Claim 39 states that the "user communications device connect[s] to the [VPS] at the corporate office."[94] Claim 39 also states that the "user communications device connect[s] to the corporate office [LAN]", that the "user communications device operat[es] as an extension of the telephony server in the corporate office" and that "the [VPS] automatically rout[es] ... communications from said corporate office to said user communications device."[95]

**B. *The Accused Device; Lucent's Virtual Telephone***

Lucent's Virtual Telephone provides customers with the ability to use their computer as a telephone from a remote location. The Virtual Telephone application is a voice-only product. To access data applications from a remote location, the remote user must bring up a separate application on the computer screen. A premise of Virtual Telephone is that the remote worker will use other, readily available technology to access the office LAN and, thus, the Virtual Telephone user will be able to access data stored on the office computer or send e-mail at the same time as speaking on the telephone. The Virtual Telephone remote user must separately log into the LAN to access the LAN's servers and their associated applications. The Virtual Telephone remote user is able to log into an e-mail server and send and receive e-mails without running the Virtual telephone application.[96]

If the remote user desires to run the Virtual Telephone application after logging into the LAN, the remote worker must separately log into the MMCX server.[97] The MMCX server is connected to the office LAN and the office PBX.[98] There are no other connections. The MMCX is not connected to the transmission media, as that term is defined in the '639 patent.[99]

Virtual Telephone uses "voice over internet protocol (IP)" which means that it turns signals into small digital packets or data packets that are placed on the office LAN and are treated like other data carried on the LAN.[100] Those packets are then routed by devices on the LAN to a remote user who has signed on to the Virtual Telephone and has signed on to the office LAN from a remote location.[101]

To use Virtual Telephone from a remote location, a remote user must first establish a connection to the LAN by running standard remote access software to log into the office remote access server ("RAS").[102] After a connection is established between the remote user and the RAS, the RAS assigns the remote user's device a temporary Internet Protocol (or "IP") address that is used by the RAS to route communi-

---

92. '639 patent, col. 27.

93. '639 patent, col. 31.

94. '639 patent, col. 31.

95. '639 patent, col. 31.

96. Dx 168, Katz Decl. ¶ 17, 30; Dx 166, Vidil Decl. ¶ 20. In contrast, in practicing the '639 patent, the remote user must connect directly to the VPS over the transmission media to send or receive e-mails.

97. Dx 168, Katz Decl. ¶ 18.

98. *Id.* ¶¶ 12–13, 19.

99. Dx 100.

100. Dx 166, Vidil Decl. ¶¶ 9–10; Dx 168, Katz Decl. ¶ 21.

101. Dx 166, Vidil Decl. ¶ 23.

102. Dx 168, Katz Decl. ¶ 15; Dx 166, Vidil Decl. ¶ 20.

cations to or from the remote user over the LAN.[103]

In the Virtual Telephone application, the PBX is manually administered to forward calls from the remote user's office extension to the MMCX server over a trunk connection after a specified number of unanswered rings.[104] This is sometimes referred to as a "coverage path." After a Virtual Telephone remote user logs onto the MMCX server, a call that is intended for the remote user's office extension is transferred to the MMCX server if the office extension is not answered.[105] If the remote user is logged into the MMCX server, the MMCX server then "packetizes" the call, i.e., it breaks the call into small packets of data and places the IP address received earlier from the RAS in front of each packet of data.[106] The MMCX server then places the data packets onto the LAN.[107] At that point, the call is a stream of data packets.[108] It bears no resemblance to the analog signal that was originally sent to the MMCX server by the PBX.

The MMCX server places all calls that it receives on the LAN. After placing the call on the LAN, the MMCX server has finished its job. In effect, the MMCX server acts as a gateway between the PBX and the LAN by turning voice calls received from the PBX into IP data packets that can be handled by the LAN.[109] When the MMCX server places the call on the LAN, the call looks just like any other IP information addressed to the client, such as an e-mail. The LAN delivers the data packets to all the servers. The RAS then picks the data packets intended for its particular

remote user off the LAN and routes them to that remote user.[110]

After the RAS sends the data packets across the transmission line to the remote user, the software in the remote user's computer reassembles (or "un-packetizes") the data packets and turns them into an analog voice call. The "soft phone" on the remote user's computer screen rings, and the remote user can answer the phone by clicking on the computer screen. The remote user can talk to the caller by using a handset or headset connected to the computer.[111]

### C. Claim Construction of Disputed Terms in the '639 Patent

Prior to the preliminary injunction hearing the parties submitted a joint claim construction chart which set forth each party's proposed construction of the terms used within claims 1, 14 and 39 of the '639 patent. During the preliminary injunction hearing, both parties presented evidence regarding the meaning of certain disputed terms in claims 1, 14 and 39. The Court finds that each term in claims 1, 14 and 39 is used consistently throughout the claims and the specification of the '639 patent.[112] The Court accepts the parties' definitions on the undisputed terms as set forth in the parties' joint claim construction chart, since these stipulated constructions comply with 35 U.S.C. § 112.[113] The Court also accepts the parties' definitions on the remaining disputed terms not discussed herein. The Court makes the following findings with respect to the material disputed terms which are to be construed in

**103.** Dx 168, Katz Decl. ¶ 15–16; Dx 166, Vidil Decl. ¶ 20.

**104.** Dx 168, Katz Decl. ¶ 14.

**105.** Id. ¶ 20.

**106.** See Dx 168, Katz Decl. ¶ 21.

**107.** Id.

**108.** Dx 168, Katz Decl. ¶ 21; Dx 166, Vidil Decl. ¶ 10.

**109.** Dx 168, Katz Decl. ¶ 21.

**110.** Dx 168, Katz Decl. ¶ 23.

**111.** Id. ¶ 24.

**112.** Plaintiff agrees (docket no. 104 at 7: "each term in claims 1, 14 and 39 is used consistently throughout the claims and the specification in the '639 patent").

**113.** Docket no. 76.

all claims as indicated herein. These terms, as construed, are the basis for the Court's conclusions with respect to injunctive relief.

### "remote user"

■ The '639 patent defines the term "remote user" as follows: "the remote user may either be a telecommuter or a road warrior, or may be a resident in a branch office, also referred to as a remote small office" who accesses a corporate office from a physically distant location over a transmission media.[114]

The claimed invention described in claims 1, 14 and 39 provides a "remote user" with a "virtual presence" to a corporate office. The claimed invention can be practiced with connectivity between one or more remote users and the corporate office.[115] The Court rejects plaintiff's proposed construction of "remote user"[116] since it omits the reference to a resident in a branch office.[117]

### "virtual presence"

■ The term "virtual presence" means a remote user's ability to send and receive voice and data communications to and from a corporate office with the full capabilities and user interfaces of the corporate office just as if the remote user were physically present in the corporate office.

The term "virtual presence" is not commonly used in the relevant art. The Court looks to the intrinsic evidence, from the perspective of one of ordinary skill in the relevant art, to determine the meaning of "virtual presence."[118]

The term "virtual presence" is used in the "summary of invention" section of the '639 patent:

> The present invention enables the concept of virtual presence or "telepresence" whereby a user at a remote location has the full capabilities and user interfaces of the corporate office *just as if* the user were physically located at the corporate office. Thus the telephone of the remote user mirrors the telephone the user sees at the corporate office, including substantially the same button configurations at substantially the same locations performing substantially the same functions.[119]

This language shows that "virtual presence" entails full functionality of the office telephone and LAN from the remote location.

The "summary of invention" states further:

> According to the invention, the remote user makes outgoing telephone calls, sends faxes, transmits data, sends email and performs internet access *as if* the remote user were physically present in the corporate office. Likewise, incoming calls, faxes, data transmissions and email received at the corporate office are routed to the remote user *as if* the remote user were physically present in the corporate office. *Therefore, a coworker or external party who telephones the user at the corporate office is unaware that the user is actually not physically located at the corporate office, but rather is at a remote location.*[120]

114. '639 patent, col. 5, lines 30–32.

115. '639 patent, cols. 1, 31; Barker Testimony, Tr. 327; Bradner Testimony, Tr. 821–22; Weiss Testimony, Tr. 1418.

116. The joint claim construction chart indicates that initially defendant proposed the same construction (docket no. 76); defendant revised its interpretation in connection with the hearing.

117. Although defendant originally did not dispute plaintiff's proposed definition of "remote

user," Lucent did object at the hearing. The Court rejects the argument (docket no. 114 at 2) that claim 40 limits the consistent definition of "remote user" in claims 1, 14 and 39.

118. *Johnson Worldwide Assocs., Inc.*, 175 F.3d at 989–90.

119. '639 patent, col. 2, lines 50–58; *see also* '639 patent, col. 5, lines 58–65 (emphasis added).

120. '639 patent, col. 2, line 64–col. 3, line 8 (emphasis added).

The plain meaning of this language shows that "virtual presence" entails transparency from the outside, that is, a person calling the corporate office for the remote worker would be connected to the remote user without being able to perceive that the remote user is not in the corporate office.

The joint claim construction chart indicates that plaintiff originally proposed this interpretation of "virtual presence": "[t]he remote user transparently operates as if, and appears to a coworker or other party to be, physically located in the remote user's corporate office."[121] Plaintiff further highlighted the central feature of transparency in its opening statement, when arguing that if the office door of the remote worker were closed, the remote worker's colleagues at the corporate office should not be able to tell that the remote worker was not in his office when a call was placed to the remote worker's office phone.[122] Two of the inventors, Dr. Barker and Mr. Witt, testified, in sum, that virtual presence allows a remote user to appear to those interacting with him or her to be in the office.[123] In the course of the preliminary injunction hearing, however, plaintiff contended that the claims do not require transparency or, as characterized by plaintiff, "true virtual presence." Plaintiff now argues that the '639 patent "describes preferred embodiments in which the virtual presence server instructs the corporate PBX to automatically forward all calls to the remote user" but, in these embodiments, the caller with a display telephone would be aware that the PBX had forwarded the call. Therefore, plaintiff argues, if virtual presence requires transparency, a preferred embodiment in the specification would not fall within the scope of the claims—an interpretation, plaintiff argues, is rarely, if ever, correct.[124] Instead, plaintiff argues that a "reasonable impression" of transparency is all that is required.[125]

The words of the patent clearly indicate that transparency was part of the claimed invention.[126] In addition, the specification repeatedly emphasizes the importance of transparency to the concept of virtual presence and defines "virtual presence" or "telepresence" to include transparency. This definition, if not dispositive, is highly relevant.[127]

Transparency is not at issue with respect to data communications.[128] Transparency is at issue with respect to voice communications. Plaintiff's expert, Mr.

---

**121.** Docket no. 76. As authority for this interpretation, plaintiff referred to the specification, '639 patent, col.2, lines 50–63 and col. 5, line 66 through col. 6, line 34.

**122.** Tr. 16–17. The summary of the invention states: "Therefore, a co-worker or external party who telephones the user at the corporate office, or sends email or a fax to the user at the corporate office is unaware that the user is actually not physically located at the corporate office, but rather is at a remote location. In general, a secretary or receptionist located just outside the user's physical corporate office location is unable to discern, without opening the door, whether the user is located in his office at the corporate office or at the remote location" ('639 patent, col. 3, lines 4–12).

**123.** Tr. 313–14, 470.

**124.** Docket no. 104 at 12.

**125.** Docket no. 104 at 12.

**126.** As noted by plaintiff in its opening argument, "[p]articular embodiments appearing in the specification will not generally be read into the claims ... What is patented is not restricted to the examples, but is defined by the words in the claims." *Specialty Composites v. Cabot Corp.*, 845 F.2d 981, 987 (Fed. Cir.1988) (citations omitted).

**127.** *Vitronics, Corp.*, 90 F.3d at 1582 ("the specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term"); *Renishaw PLC*, 158 F.3d at 1250.

**128.** Although the '639 patent purports to offer the full capability of the office LAN to the remote user, Mr. Witt admitted that there are some data, such as files sent to a fixed IP address of an office computer by file transfer protocol, that cannot be accessed remotely (Tr. 542–46, 566–68).

Bradner, a person with ordinary skill in the art, agreed at the preliminary injunction hearing that, under the words of the '639 patent, a person who calls the office number of the remote user and whose call is transferred to a remote location should not be able to perceive that the remote worker is not in the office; therefore, if the forwarding of the call is apparent, it would be "incomplete virtual presence, at best" and that "virtual presence" "probably" is not present as that term is used in the patent.[129] To practice the invention, the PBX must send calls to the remote worker in a way that insures transparency.[130]

*"identification information" and "address information"*

■ The term "identification information" means specific information from the user communication device that identifies that specific device, its user and where the device is located, that is stored in the VPS and that is used by the VPS to determine if the data and voice communications received by the LAN or telephony server, respectively, are intended for the remote user and used by the VPS to route such data and voice communications to the remote user.

■ The term "address information" means a designation of the identity of the user communication device sufficient to indicate where the user communication device can be contacted. The information is typically a telephone number.

"Identification information" must have all of the following characteristics: (1) it must be "of said user communications device;"[131] (2) it must be received by and provided to the VPS from the user communications device;[132] (3) it must be used to determine if a communication from the LAN or PBX is intended for the remote user;[133] (4) it must be used by the VPS to "route" communications received by the LAN or PBX which are intended for the user communications device to the remote user communications device;[134] and (5) it must provide the identity of the remote user.[135] In sum, identification information identifies the remote user communications device and how the remote user's computer can be contacted by the VPS.

The only example of identification information provided by the '639 patent is "caller ID" information in a description of "the preferred embodiment."[136] Mr. Bradner conceded that no other information is provided in the patent as to what is "identification information" although the patent allows that other types of identification information may be received.[137] The specification distinguishes "identification information" from "security data"[138]

129. The Court notes that Mr. Bradner's declaration in opposition to summary judgment asserts that "virtual presence" under the patent "only requires that the remote worker reasonably appear to be in the office" rather than transparency (docket no. 108, ex. 1 at 2). To the extent, that this expert's testimony refers to claim construction, it has been supplanted by the Court's legal decision on the meaning of "virtual presence" which includes the extension of the full capabilities of the PBX and LAN to the remote worker.

130. Mr. Bradner testified that the '639 patent covers situations in which there is no call forwarding at all (Tr. 816–17). For example, Mr. Bradner agreed that if a remote worker never works in the office and, in fact, does not have an office telephone, the VPS does not use call forwarding or remote call forwarding to forward office calls to the remote worker, but, instead, the remote worker is assigned an extension on the PBX that is permanently attached to the VPS.

131. The PTO Notice of Allowability, Nov. 13, 1997, at 3 (Dx 2) stated: "the user communication device connects to the corporate office and provides identification information to the [VPS]."

132. '639 patent, col. 31, lines 40–42.

133. '639 patent, col. 34, lines 47–52.

134. '639 patent, col. 27, lines 28–34.

135. Bradner testimony, Tr. 911–15.

136. '639 patent, col. 18, lines 42–52; figs. 12 and 13.

137. '639 patent, col. 18, lines 50–52.

138. *See, e.g.,* '639 patent, figures 12 & 13; col. 17, lines 43–52; col. 18, lines 11–18.

but does not preclude the possibility that security data could be included within identification information.

Caller ID information may be sufficient for use as the identifier when the PSTN is the network between the VPS and the user communication device. But, if other networks are present, other identifiers would be necessary.[139] One with ordinary skill in the art would consider that "identification information" used in routing data in an IP network may include an IP address,[140] but, as Bradner conceded, cannot consist only of an IP address.[141] An IP address alone cannot meet the first and fifth criteria listed above and does not meet the third and fourth criteria with respect to voice communications.[142] Moreover, the '639 patent expressly claims an embodiment of the VPS that disconnects from the remote user and then reconnects to the remote user when the remote user receives a call at the office;[143] and IP address alone cannot be used to call the remote user and reestablish a connection between the remote user and the VPS. Significantly, the PTO distinguished prior art in which the "identification information" was an IP address, indicating that the examiner concluded that an IP address alone was not "identification information."[144]

The term "address information" as used in claim 14 is similar to "identification information" found in claims 1 and 39. "Address information" refers to the identifier portion of identification information that indicates the identity of a user communications device sufficient to indicate where the user communications device can be contacted. Address information received from the user communications device is stored or placed into the memory of

the VPS. The VPS accesses or retrieves the stored address information from its memory to route communications received by either the LAN or the telephony server to the remote user communications device over the transmission media.

*"routes"*

■ The term "routes" means to choose an appropriate destination from two or more possibilities and to direct based on that choice.

The VPS routes by directing a voice or data communication meant for a particular remote user over the transmission media to the appropriate remote user communications device. Communications are "routed from either the telephony server or the [LAN] to said user communications device" by means of the "transmission media." Routing implies a choice between alternative destinations. Although plaintiff's proposed construction requires "routing" to be based on "identification information," and although a person with ordinary skill in the art would understand how an IP address is used in data routing, the patent does not specify a single method of routing.[145]

The term "automatically routes" or "automatically routing" as used in claim 39 means that routing, as defined above, is accomplished without the further intervention or instruction to the user communication device or by the remote user.

*"virtual presence server (vps)"*

■ The term "virtual presence server" means a server located at the corporate office that executes software that enables the remote user to maintain a virtual presence at the corporate office by dialing

---

139. When discussing channels of communication, the specification refers to TCP/IP network protocol which a person with ordinary skill in the art would understand uses IP addresses as identifiers. Bradner testimony, Tr. 690–93; Witt testimony, Tr. 447; *see* '639 patent, col. 15, lines 30–34.

140. Weiss testimony, Tr. 1506, 1508–09.

141. Tr. 928–30.

142. Weiss testimony, Tr. 1401–05.

143. '639 patent, claims 11, 12, 13, col. 26, lines 61–66 to col. 27, lines 1–20; *see also* col. 22, lines 7–30.

144. Dx 2, PTO, Notice of Allowability, Nov. 13, 1997, at 4 (Slaughter).

145. Witt testimony, Tr. 557–61.

the VPS and establishing a direct connection.

The "summary of the invention" section of the '639 patent states: "The [VPS] executes software that enables the remote user to maintain a virtual presence at the corporate office" by dialing the VPS and establishing a connection.[146] Access from the remote user to the VPS is through the PSTN and not the LAN. After the remote user connects to the VPS through the PSTN, then the remote user connects to the LAN through the VPS. Access from the remote user to the telephony server is not through the LAN or RAS (remote access server) but directly through the VPS.

Plaintiff's proposes a definition of VPS as a node on the LAN. With respect to data communications, the VPS may be a node on the LAN even though figure two to the patent suggests that the VPS is not connected directly to a LAN but connected to a LAN through a RAS. With respect to voice communications, a remote worker receives a call at a remote location when the call is sent from the PBX through the VPS. The LAN is not involved at all in the delivery of the call to the remote worker and, so far as voice is concerned, the VPS is not ever a node on the LAN. Accordingly, plaintiff's definition of VPS to mean an node on a LAN is not accepted.

Plaintiff also suggests that the VPS must be capable of supporting more than one user at the same time. The definition of "remote user" makes it clear that a system that covers only one user is cov-

ered by the '639 patent. The two testifying experts, Bradner and Weiss, people with ordinary skill in the relevant art, each agreed that a server can serve only one user and that the claimed invention could be practices by a system that supports only one remote user.[147]

*"virtual presence server (vps) communications device"* [148]

■ A virtual presence server communications device is a modem, ISDN adapter or similar device attached to the VPS that connects to the VPS through the transmission media to allow the remote user to dial up the VPS and establish a connection with the VPS through the connection media in order to transmit and receive communications.

*"coupling" or "coupled"*

■ The term "coupling" or "coupled" refers to the direct connection of two or more circuits or systems in such a way that power or signal information may be transferred from one to the other.

Lucent proposes that "coupling" or "coupled" requires a direct connection.[149] Plaintiff argues that this construction is contrary to a recent Federal Circuit case in which "coupled" was not limited to a mechanical or physical coupling.[150] Rather, plaintiff argues that coupling merely requires an association such that information may be exchanged.[151] Plaintiff further argues that if Lucent's definition were accepted, the remote user could never "couple" to the VPS because of the numerous intermediate hops within the PSTN.

Although the '639 patent discusses "coupl[ing] through a communication mechanism or channel" [152] which, arguably,

146. '639 patent, col. 2, lines 34–39.

147. Bradner testimony, Tr. 821; Weiss testimony, Tr. 1418. Dr. Barker, an inventor, testified that the claimed invention could be practiced by a system that supports only one remote user (Tr. 327).

148. Although competing constructions of this term are not included in both parties' proposed findings and conclusion, the joint claim construction chart indicates a disagreement between the parties as to the meaning of this

term and, accordingly, this Order addresses the term.

149. Docket no. 76 at 10. Weiss testified that "[c]oupling ...[ is] even stronger than connected. Coupling [means] literally cabled together" (Tr. 1494).

150. *Johnson Worldwide Assocs., Inc.,* 175 F.3d at 992.

151. Docket no. 104 at 18–19; docket no. 114 at 3.

152. '639 patent, col. 4, lines 35–37.

suggests intermediate connections or "hops," the patent also discusses the VPS having "connections" that are adapted for "coupling" to a transmission media, the telephony server and the LAN and the patent refers to the user communications device as being adapted for "coupling" to the transmission media.[153] These "couplings" imply direct connections between the elements, without unnecessary intervening connections between the elements, as illustrated by figure 2 of the patent,[154] but do not exclude intermediate "hops" within an element, for example, within the PSTN. The direct connections also do not exclude the logical connections proposed by plaintiff.[155] This construction is not inconsistent with the teaching of *Johnson Worldwide Associates, Inc.*

### *"one or more connections for coupling to transmission media"*

The term "one or more connections for coupling to transmission media" means at least one point of connection to a transmission media such as the PSTN that is different from the "one or more connections for coupling to a telephony server and a local area network."

Claim 1 of the '639 patent describes three connections: (1) a connection from the user communications device at the remote site to the VPS at the corporate office through the transmission media (e.g., PSTN); (2) a connection from the VPS to the telephony server (e.g., PBX); and (3) a connection from the VPS to the

LAN.[156] Claim 14, which is dependent on claim 1, necessarily requires the same three connections. Claim 39 describes the first connection.

Plaintiff argues that even though the three separate connections are shown in the embodiments to the '639 patent, claims 1 and 14 uses only the phrase "one or more connections for coupling" and that three distinct connections are not required.[157] Plaintiff urges that the specific phrase "one or more connections for coupling" means only "at least one point of connection for a data communications path."[158] The Court cannot agree. The claims themselves require connections and the claims describe distinct connections. Claim 1 requires that the remote user dial up, using the transmission media (e.g., PSTN), the "virtual presence server communication device" (e.g., one or more modems or one or more ISDNs) to establish a connection with the VPS.[159] The VPS is separately connected to the LAN and separately connected to the PBX.[160] The connections are most significant to the '639 patent in part because the examiner distinguished prior art based on the nature of the connections.[161]

### D. *Plaintiff Has Not Met Its Burden of Showing Entitlement to a Preliminary Injunction*

Plaintiff's amended complaint and motion for injunctive relief asserts one claim: patent infringement. This claim will be

153. *See* '639 patent, col. 4, lines 40–58.

154. *Autogiro Co. v. United States*, 384 F.2d at 398 ("[i]n those instances where a visual representation can flesh out words, drawings may be used in the same manner and with the same limitations as the specification").

155. Docket no. 108 at 8.

156. '639 patent, col. 25, line 31–col.26, line 6.

157. Plaintiff's proposed findings of fact and conclusions of law do not address the connections in claim 39 regarding this issue. Docket no. 104 at 19–20.

158. Docket no. 104 at 19–20.

159. '639 patent, col. 2, lines 38–40 and figs. 1 and 2.

160. '639 patent, col. 25, lines 44–49.

161. Dx 2 at 3, Notice of Allowability, Nov. 13, 1997 ("The prior art cited by both applicant and the examiner requires the remote user to connect through the telephony server.") The patent specification distinguished the prior art based on the fact that the '639 patent did not claim a connection through the PBX: "It is noted that the system shown in FIGS. 1 and 2 does not include a key system or PBX inter-

examined in the context of plaintiff's burden of proof in seeking a preliminary injunction.

### 1. *Reasonable Likelihood of Success on the Merits*

■ To establish a likelihood of success on the merits, a plaintiff seeking a preliminary injunction in a patent infringement suit must show that it likely will be able to prove infringement and that it likely will be able to overcome any challenge to the validity or enforceability of its patent.[162] In this case, the burden is always on the Data Race to demonstrate entitlement to preliminary injunctive relief, but such entitlement is determined in the context of the burdens that would inhere at a trial on the merits. Therefore, Lucent, the patent challenger, retains the burden of establishing invalidity and Data Race retains the burden of showing a reasonable likelihood that Lucent cannot produce clear and convincing evidence that the patent is invalid and, therefore, that the attack on the validity of the patent will fail.[163]

■ Title 35, United States Code, section 271 makes liable anyone who (a) "without authority makes, uses, offers to sell or sells any patented invention;" (b) "actively induces infringement of a patent"; or (c) "offers to sell or sells . . . a component of a patented [invention] . . . knowing the same to be especially made or especially adapted for use in an infringement of such patent. . . ." As noted, "[a]n

infringement analysis entails two steps: (1) the claims must be construed; and (2) the properly construed claims must be compared to the allegedly infringing device."[164] At the preliminary injunction stage, Data Race must show reasonable likelihood of succeeding on its claim that Lucent is infringing its patent. At trial, as a patentee, Data Race bears the burden of proving infringement by a preponderance of the evidence.[165] "To establish literal infringement, every limitation set forth in a claim must be found in an accused product, exactly."[166] To establish infringement under the doctrine of equivalents, every limitation of the asserted claim or its equivalent must be found in the accused product or process and the "equivalent" differs from the claimed invention only insubstantially.[167]

The presumption of validity of a patent, being procedural and not substantive, does not alone create a presumption of irreparable harm.[168] Rather, the presumption of validity acts as a procedural device to place the burden of going forward with evidence and the ultimate burden of persuasion of invalidity on the alleged infringer. It does not, in this case, relieve Data Race from the carrying the normal burden of demonstrating it likely will succeed on all disputed liability issues at trial.

For the reasons discussed further below, the Court concludes that Data Race has not established a reasonable likelihood of success on the merits. Although, as discussed further below, the Court finds that Data Race has shown a reasonable likelihood that Lucent will not show that the patent is invalid,[169] the Court also finds

vening between the [VPS] and the remote users" ('639 patent, col. 5, lines 45–48).

**162.** *Vehicular Techs. Corp. v. Titan Wheel Int'l, Inc.,* 141 F.3d 1084, 1088 (Fed.Cir. 1998).

**163.** *H.H. Robertson Co. v. United Steel Deck, Inc.,* 820 F.2d 384 (Fed.Cir.1987).

**164.** *Loral Fairchild Corp. v. Sony Corp.,* No. 97–1017, 1999 WL 373189, at *5 (Fed.Cir. June 8, 1999).

**165.** *CVI/Beta Ventures, Inc. v. Tura LP,* 112 F.3d 1146, 1161 (Fed.Cir.1997), *cert. denied,*

522 U.S. 1109, 118 S.Ct. 1039, 140 L.Ed.2d 105 (1998).

**166.** *Southwall Techs., Inc. v. Cardinal IG Co.,* 54 F.3d 1570, 1575 (Fed.Cir.), *cert. denied,* 516 U.S. 987, 116 S.Ct. 515, 133 L.Ed.2d 424 (1995).

**167.** *Warner–Jenkinson Co.,* 520 U.S. at 39–40, 117 S.Ct. 1040.

**168.** *T.J. Smith & Nephew Ltd. v. Consolidated Med. Equip., Inc.,* 821 F.2d 646 (Fed.Cir. 1987).

**169.** *Chrysler Motors Corp.,* 908 F.2d at 954; *Genentech,* 108 F.3d at 1364.

that Data Race has not established a reasonable likelihood that Virtual Telephone infringes the '639 patent. Based on the findings herein, the evidence shows that: Virtual Telephone does not infringe any claim of the '639 patent because: (1) Virtual Telephone does not provide "virtual presence" as required by claims 1, 14 and 39; (2) Virtual Telephone does not have the connections required by claims 1, 14 and 39; (3) Virtual Telephone performs no "routing" as required by claims 1, 14 and 39; and (4) Virtual Telephone does not use "identification information" as required by claims 1, 14 and 39. Accordingly, the Court concludes that Data Race has not carried its burden of showing reasonable likelihood of success on the merits of its claim for infringement.

### Irreparable Harm

██ Because Data Race has not made a clear showing that the '639 patent was infringed, there is no presumption of irreparable harm.[170] Moreover, even if Data Race had established reasonable likelihood of success on the merits (or to have prevailed on the merits of its infringement claim, as discussed further below), Data Race has not adequately proved irreparable harm that entitles it to injunctive relief.[171] As a general rule, a preliminary injunction will be refused when the accused infringer is solvent and money will adequately compensate.[172] There is no presumption that money damages will be inadequate.[173] There is no evidence that Lucent is not solvent.

██ The evidence shows that Lucent has never sold Virtual Telephone or offered it for sale. The four customers who are "beta" testing a version of Virtual Telephone have not purchased Virtual Telephone and cannot purchase it until Lucent makes each an offer to sell.[174] Plaintiff relies on a portion of Mr. Katz's deposition in which he stated, and then modified, his opinion that the MMCX with the Virtual telephone application had been offered for sale to the beta test customers.[175] Katz's unsupported subjective belief cannot take precedence over the written beta test contracts which expressly state that Lucent has not and may not ever offer the Virtual Telephone application for sale.[176] Unlike the price quotation letters considered by the Federal Circuit in *3D Systems, Inc. v. Aarotech Laboratories, Inc.*,[177] the beta test contract in evidence does not contain a fixed price term or even an offer to sell.

As discussed further below, at the preliminary injunction hearing Data Race announced to the Court that it intended to pursue a theory of "corrective advertising" damages at the trial on the merits, but it conceded that Data Race had not undertaken any such advertising nor did it produce any evidence of Lucent's advertising expenditures relating to Virtual Telephone that might illustrate how such damages might relate to Data Race's harm. Additional evidence of corrective advertising damages have not been presented to the Court in response to summary judgment.

With respect to "traditional" patent infringement damages, and as discussed further below, Dr. Barker testified that Data Race had no evidence that any losses incurred by Data Race in connection with Be There! were attributable to Lucent and that he could not identify any customer who refused to buy Be There! because of Lucent's Virtual Telephone. Dr. Barker

**170.** *Intel Corp.*, 995 F.2d at 1570 (clear showing of both validity and infringement).

**171.** Because of the Court's analysis of the likelihood of success on the merits and infringement, the Court does not consider Data Race to be entitled to a presumption of irreparable harm.

**172.** *Smith Int'l, Inc. v. Hughes Tool Co.*, 718 F.2d 1573 (Fed.Cir.1983).

**173.** *Nutrition 21 v. United States*, 930 F.2d 867 (Fed.Cir.1991).

**174.** Dx 150 at 3; Dx 168, Katz Declaration ¶ 92.

**175.** Px 1A at 192.

**176.** Dx1A at 194–95; Dx 150 at LUC 58132.

**177.** 160 F.3d 1373, 1379 (Fed.Cir.1998).

testified that Data Race encouraged the public and its own customers to try out Virtual Telephone because of its confidence that Be There! was a superior product. Even if the Court were to consider the declaration of Walter Bratic, submitted in opposition to summary judgment, in reference to this element of the test for a preliminary injunction, plaintiff has not met its burden.

In sum, Data Race has produced insufficient evidence of damages or harm.

### Balance of Hardships

Regarding this factor, the Court must balance the harm to the patent owner that will result from the denial of the preliminary injunction with the harm to the alleged infringer that will result if the injunction is entered.[178] Plaintiff argues that the "negligible" cost to be incurred by Lucent if the preliminary injunction issues is outweighed by the harm to Data Race if the preliminary injunction does not issue.[179] The Court cannot agree. Even assuming, *arguendo*, that Data Race has demonstrated a reasonable likelihood that Virtual Telephone is infringing, Data Race's inability to identify any lost sale of Be There! or any quantifiable detriment to any customer relationship suffered by Data Race due to Lucent's development of Virtual Telephone is key. Dat Race's showing on harm must be balanced against the harm caused to Lucent by an injunction which would prevent if from continuing to test, perfect and bring to the competitive marketplace a product which, based upon the record in this case, is not infringing.

Therefore, the Court concludes that Data Race has not met its burden of showing that the threatened injury it would suffer if injunctive relief did not issue outweighs the damage granting the injunction would cause to defendant.

### Tolerable Effect on the Public Interest

Regarding this factor, the focus typically is on whether there exists some critical public interest that would be harmed by the grant of an injunction.[180] Plaintiff argues that the public interest is served by protecting patents. The Court does not quarrel with this black letter statement of law and public policy. Data Race has not shown that denying the injunction will disserve the public interest in the facts and circumstances of this case. The public generally benefits from aggressive competition in the market place among non-infringing products.

### E. Plaintiff Has Not Established a Genuine Issue Regarding Damages

Lucent has moved for summary judgment on plaintiff's claim for damages as a result of Lucent's alleged infringement of the '639 patent arguing that there are no disputed issues of material fact with respect to damages.[181] In response, plaintiff argues that it is seeking both traditional compensatory damages and damages under a "corrective advertising" theory and that both aspects of their damages claim should be submitted to a jury for final resolution.[182]

Section 284 makes compensatory damages in an amount not less than a reasonable royalty available as a remedy for infringement.[183] Traditionally, compensatory damages are proven by evidence of actual lost profits or an established or reasonable royalty.[184] Data Race bears the burden of proving damages by a preponderance of the evidence.

Prior to a discussion of whether plaintiff has sustained its summary judgment burden, the Court once again addresses plaintiff's changing positions on damages and

---

**178.** *Hybritech, Inc.,* 849 F.2d at 1457.

**179.** Docket no. 65 at 11.

**180.** *Hybritech, Inc.,* 849 F.2d at 1458.

**181.** Docket no. 110 at 60–66.

**182.** Docket no. 108 at 22–30.

**183.** 35 U.S.C. § 284.

**184.** *SmithKline Diagnostics, Inc. v. Helena Labs., Corp.,* 926 F.2d 1161, 1164 (Fed.Cir. 1991).

724

the adequacy of the opportunity afforded plaintiff to conduct damages-related discovery. On May 14, 1999 defendant filed an advisory with the Court notifying the Court that Data Race was not at that time pursuing any relief other than injunctive relief.[185] The advisory specifically indicated that Data Race "currently does not seek recovery or have any evidence of economic or monetary damages; and, although a claim for damages is pleaded in plaintiff's first amended original complaint for patent infringement, plaintiff seeks only permanent injunctive relief in this action." [186] At no time did Data Race contest that advisory. In reliance on the advisory, defendant did not pursue damages-related discovery from plaintiff.

At the August 30, 1999 preliminary injunction hearing, Data Race announced that it intended to pursue a damages remedy and confirmed that it had served on defendant a second set of interrogatories regarding damages on Friday, August 27, 1999.[187] Data Race acknowledged, in sum, that it had no evidence of lost profits or "traditional damages" but argued that the Court should allow plaintiff to prove compensatory damages under a "corrective advertising" theory or model.

The immediate significance of Data Race's assertion of a claim for damages during the preliminary injunction hearing related to Lucent's request that the preliminary injunction hearing be consolidated with a trial on the merits. Date Race opposed the motion, arguing that it had a right to a jury trial on its request for damages. The Court denied the motion to consolidate, holding that Data Race had a Seventh Amendment right to a trial by jury on its claim for damages. The Court also declined to extend discovery in order to give Data Race additional time to collect evidence of damages.[188] Although Data Race filed its original complaint, request for injunctive relief and request for expedited discovery in August 1998, Data Race apparently undertook no discovery focused on damages until Friday, August 27, 1999 when plaintiff served its second set of interrogatories. The answers to the interrogatory requests were not due until well after the expiration of the August 31, 1999 discovery deadline.[189] The parties did not agree to conduct discovery after the expiration of the discovery deadline. Lucent proffered that the damages and accounting information plaintiff sought was voluminous. Had the Court allowed opposed discovery after the cut-off date, fairness would have required a reciprocal extension for defendant to pursue defensive discovery on damages, an action which, in turn, would have compelled a further continuance in the filing of dispositive motions and, likely, the trial. Data Race has not established a proper predicate to justify such actions.

Data Race explains that it decided to revive its claim for damages when it learned of Lucent's decision to shift the Virtual Telephone application from the ITS–E platform to the MMCX server and of Lucent's plan to make Virtual Telephone "generally available" in mid-August, 1999. Plaintiff contends that it did not learn of these decisions until it took a deposition of one of Lucent's representatives on July 22, 1999 and, thereafter, plaintiff decided to renew its motion for preliminary injunction and decided to pursue damages.

Although it is well past summer 1999, there is no evidence that Lucent has made MMCX release 3.0 "generally available."

185. Docket no. 50.

186. Docket no. 50 at 1.

187. Tr. 1208–10.

188. Docket nos. 84 and 85.

189. The Order concerning consent trials entered in this case on October 29, 1998 expressly provides that "[u]nopposed discovery may continue after the deadline for discovery so long as it does not delay other pretrial proceedings" (docket no. 36 at 2 ¶9). Implicit in this requirement is that discovery—absent agreement—be completed before the expiration of the discovery deadline.

Moreover and more fundamentally, Data Race has not countered the facts which demonstrate that it knew in 1998 that Lucent intended to release an MMCX-based Virtual Telephone in the summer of 1999. Vidil's affidavit, filed in connection with the initial preliminary injunction motion, stated that Lucent reserved the right to release Virtual Telephone in the future but at that time did not plan to release Virtual Telephone on the ITS–E platform.[190] Vidil was deposed in November 1988 and testified that Lucent was considering moving Virtual Telephone to the MMCX platform and releasing that MMCX-based version of Virtual Telephone in the summer of 1999.[191] Data Race requested documents relating to the MMCX-based Virtual Telephone as early as March 8, 1999 and again on May 6, 1999 and those documents, timely produced, showed a projected release date in the summer of 1999.[192]

Thus, Data Race's contention that it was not aware until July 22, 1999 of the shift of Virtual Telephone from ITS–E to MMCX platform and the decision to release MMCX release 3.0 with the Virtual Telephone application in the summer of 1999 is not supported by the record. Data Race had notice of Lucent's intentions as early as November 1998. Data Race had ample time available to pursue timely discovery of damages, if not in November 1998, or in March 1999, certainly in June 1999 when documents regarding MMCX version 3.0 were produced in response to the May 5, 1999 discovery request.[193] Even if plaintiff had pursued the discovery upon the completion of the July 22, 1999 deposition, the sought-after discovery could have been completed within the existing discovery deadline. Data Race, as plaintiff, may elect to pursue a damage remedy in connection with its claim for infringement. But, plaintiff, as any other civil litigant, must do so within time parameters established by the Court.[194]

As noted, at the preliminary injunction hearing, Data Race conceded that it had no evidence of "traditional" damages.[195] Data Race asserted that instead of traditional damages, it would pursue damages under a "corrective advertising theory."[196] Within trademark law, corrective advertising has been ordered both as an aspect of injunctive relief (infringer ordered to conduct corrective advertising)[197] and as an aspect of compensatory damages (infringed party compensated for past or

190. Docket no. 15.

191. Dx 166, Vidil Decl. ¶ 4; docket no. 73 at 11.

192. Docket no. 73 at 11; docket no. 113 at 14 n.4 and ex. 2.

193. Docket no. 113, ex. 2.

194. *Aviation Specialties, Inc. v. United Technologies Corp.*, 568 F.2d 1186, 1190 (5th Cir. 1978) (plaintiff filed action in May but had not initiated discovery by November).

195. Specifically, Data Race acknowledged that the absence of any sales of Virtual Telephone precluded a traditional calculation of a reasonable royalty (Tr. 630–36). Dr. Barker acknowledged that Data Race did not have proof of lost profits (Tr. 373–82). Plaintiff acknowledged it its opposition to consolidation (docket no. 77 at 4) that, "instead of lost profits" it was seeking corrective advertising damages.

196. Therefore, Data Race argued Lucent need not review any of Data Race's accounting records, as it would under traditional damages discovery, since Data Race was pursuing damages only under the corrective advertising theory (Tr. 1093, 1209–10). *See also* Tr. 1760–61 (Data Race acquiesces in statement that it was not seeking any damages except corrective advertising damages); and docket no. 77 at 2 n.5, 4 and 5. When the Court concluded that Data Race "does not argue that it should be awarded a reasonable royalty or that it can demonstrate lost profits—traditional aspects of a reasonable royalty in a patent case" but was requesting damages only under the corrective advertising theory (docket no. 85 at 6), Data Race did not notify the Court that its understanding was not correct.

197. E.g., *Taco Cabana v. Two Pesos*, 932 F.2d 1113, 1125 (5th Cir.1991) (corrective advertising is discussed in section of opinion entitled "injunctive relief."); *Burndy Corp. v. Teledyne Industries*, 748 F.2d 767, 769 (2d Cir. 1984) ("injunctive relief in the form of corrective advertising").

prospective corrective advertising).[198] With respect to corrective advertising as a component of compensatory damages, Data Race has not shown that Data Race itself has engaged in any corrective advertising to counter Lucent's actions for which a damage award would be appropriate. Thus, there is no allegation or evidence that a corrective damage award would compensate plaintiff for any past corrective advertising expenses. Data Race has spent no money itself in sponsoring "corrective advertising" to counteract Lucent's "beta" tests. Therefore, there is no genuine issue of material fact regarding damages incurred by Data Race for its own corrective advertising expenditures.

Plaintiff also argues that it may obtain corrective advertising compensatory damages based on plaintiff showing how much Lucent spent in developing and beta testing Virtual Telephone on both the ITS–E and MMCX 3.0 platforms.[199] Plaintiff argues it would use this information to fashion an objective basis for a claim for corrective advertising damages based on the FTC percentage-based model.

In response to defendant's motion for summary judgment on damages, plaintiff submitted no summary judgment evidence to provide an objective foundation for corrective advertising damages. Other than announcements on Lucent's web site regarding the development of the Virtual Telephone application[200] and, later, its shift to the MMCX platform and plans to release the product in the future, Data Race has proffered no evidence of "adver-

tising" by Lucent.[201] Evidence that Lucent announced its "breakthrough product"[202] is not proof of actual advertising expenses incurred by Lucent to promote an infringing product. Even assuming that any of the beta tests of a version of Virtual Telephone are an infringing use or an inducement of an infringing use such that Data Race may be entitled to damages,[203] Data Race has not discharged its summary judgment burden of creating a genuine issue of material fact regarding the amount of such damages. Summary judgment does not focus on the sufficiency of a claim but whether the fact-finder must resolve genuine issues of material fact. Data Race has produced no evidence of corrective advertising damages. The Court may still consider corrective damages as a component of injunctive relief at the conclusion of the case.

In post-hearing briefing, plaintiff argues that "Data Race has sufficient evidence of damages to overcome Lucent's motion for summary judgment,"[204] asserting—contrary to its earlier representations—that it intends to pursue a claim for "traditional" compensatory damages, that is, lost profits and/or a reasonable royalty for Lucent's use of Virtual Telephone. In support, plaintiff tenders a declaration from its proposed expert, Walter Bratic, in opposition to Lucent's motion for summary judgment on damages.

■ Even if the Court were to consider Mr. Bratic's proposed declaration, it clearly does not meet plaintiff's summary judgment burden with respect to lost prof-

**198.** E.g., *Big O Tire Dealers, Inc. v. The Goodyear Tire and Rubber Co.*, 561 F.2d 1365, 1374 (10th Cir.1977) (jury award of $2.8 million to enable plaintiff to engage in corrective advertising)(and cases cited therein).

**199.** Docket no. 77, exhibit 3.

**200.** Data Race was aware of the Lucent web site as early as the time of its decision to withdraw its first request for a preliminary injunction. Docket no. 22, Witt Decl. (at least 20 references to the Virtual Telephone appeared on Lucent's web site).

**201.** Docket no. 65 at 8. Data Race proffered this evidence in its motion for preliminary

injunction in support of its position that Lucent had "offer[ed]" Virtual Telephone "for sale." Data Race's novel theory on corrective advertising damages was made to the Court for the first time during the course of the preliminary injunction hearing.

**202.** Docket no. 22, Witt Decl.

**203.** *Roche Products, Inc. v. Bolar Pharmaceutical Co., Inc.*, 733 F.2d 858, 861 (Fed.Cir. 1984).

**204.** Docket no. 108 at 22.

its damages. In order to recover lost profits, Data Race must show that but for the infringement, it would have made the infringer's sales.[205] Bratic recites that "[a]t this time, I have not determined if there are any lost sales suffered by Data Race as a result of Lucent's introduction of its Virtual Telephone application on the MMCX 3.0 product" and that he has "not yet determined if lost profits is the appropriate measure of damages."[206] In sum, Data Race has not offered any evidentiary support for its revived lost profits theory.

Bratic's declaration also addresses the reasonable royalty component of compensatory damages. Bratic states that he has determined that a reasonable royalty of 1.5% of "net sales of the MMCX 3.0" would be a reasonable royalty for an award of $428 for each of three of the beta test sites for a total of $1,284.00 in damages.[207] Bratic's declaration concedes that Lucent has not sold the Virtual Telephone application for the MMCX release 3.0, and, therefore, the royalty is only based on an estimated sales price for installation of Virtual Telephone. Further, Data Race has offered no evidence on the software provided to the beta test customers, the configuration of the product involved in the beta tests, how the beta tests were conducted or whether or not the customers even used the beta product.[208] Without proof of the product involved in the beta tests and its use, the Court cannot make a finding that the product being beta tested is infringing or inducing infringement; therefore, no reasonable royalty for use or inducing the use of the invention in connection with the beta tests can be computed. There is no evidence that the product being beta-tested would be the product Lucent would offer for sale to the general public. Absent proof about the beta tests, Data Race has insufficient evidence to withstand summary judgment on "reasonable royalty" damages.

■■■ More fundamentally, as acknowledged by plaintiff in its summary judgment briefing, the Court's consideration of the Bratic's declaration is problematical. The deadline for the designation of experts has long since expired.[209] The discovery deadline has expired. The dispositive motion deadline has expired. Yet plaintiff asks the Court to consider a declaration from a proposed expert to defeat summary judgment and, presumably, to allow that expert to testify at trial. For the same reasons which support the Court's decision not to allow contested discovery after the discovery deadline, Data Race has not demonstrated good cause for the late designation of an expert on damages. Because Data Race "could not offer [this] expert at trial, [it] cannot use the expert witness' affidavit to oppose summary judgment."[210]

---

**205.** *Oiness v. Walgreen Co.*, 88 F.3d 1025, 1029 (Fed.Cir.1996).

**206.** Docket no. 108, ex. 2 at 6. A lost profits theory is speculative. Data Race does not dispute that Lucent has not sold Virtual Telephone. Bratic's calculation of "lost profits" based on the belief that Lucent's development of Virtual Telephone may have led one of plaintiff's customers, Schering Plough, not buy Be There! is not supported in the record. Contrary to Dr. Barker's initial belief and Bratic's declaration, Schering Plough did purchase at least one Be There! system, a matter which Data Race touted to others (Tr. 338–69, 371; docket no. 108, ex.2 at 5–6). Further, Data Race encouraged customers to try Virtual Telephone and to compare it to Be There! (Tr. 388).

**207.** Docket no. 108, ex. 2 at 10. *See also* docket no. 108, ex. 2 at 3 (1.5% times Lucent's announced sales price of $28,500 for the MMCX release 3.0). Plaintiff elsewhere states that Lucent has four beta test sites (docket no. 104 at 33).

**208.** *See* Px1A at 114–15, 192–94.

**209.** *See* docket nos. 33 (party asserting claim for relief shall designate expert(s) on or before February 15, 1999); 46 (extended to May 5, 1999) and 58. Motions to submit supplemental witness designations were to be filed by April 1, 1999 (docket no. 33) or before the expiration of the applicable deadline (docket no. 36 ¶ 7).

**210.** *Geiserman v. MacDonald*, 893 F.2d 787, 792 (5th Cir.1990). *See also* Fed.R.Civ.P. 26(a)(2) and 37(c)(1).

In sum, without evidence of damages, Data Race has no right to present its theory of damages to a jury. The issues remaining in this case concern plaintiff's request for injunctive relief and matters raised by defendant's answer.[211] The Court may decide the remaining issues in this case as a finder of fact pursuant to Fed.R.Civ. 65(a). Moreover, irrespective of a right to trial by jury, the Court may address any pending issue if the prerequisites for summary judgment have been satisfied. In other words, there is no right to jury trial on an issue when summary judgment is properly granted on an issue.[212]

The Court is mindful that the fact-intensive nature of certain issues militates against the precipitous grant of summary judgment. Because the remedy can be drastic, its application should be accompanied by careful consideration for the entire record and the relevant law.[213] In this case, plaintiff has failed to timely pursue evidence of damages to entitle it to pursue a damages claim before a jury. Plaintiff had a fair opportunity to fully develop the record on all substantive issues in this case and plaintiff has and will receive full consideration of its request for injunctive relief on the merits of each of its claims. The summary judgment on damages is narrow in scope and does not, after the lengthy preliminary injunction hearing, mean that the remaining issues in the case will be submitted on a documentary record alone, as in the typical summary judgment case. Even on damages, the preliminary injunction hearing transcript supports a conclusion that in every possible instance of eliciting testimony on damages,[214] such testimony was obtained. That plaintiff's submission on damages was focused on documentary evidence tendered to the Court with its opposition to the motion for summary judgment is attributable to plaintiff's decision not to conduct discovery on damages in the ample time period available for discovery.

## F. *Infringement Analysis*

### 1. *Literal Infringement*

In order to establish literal infringement, a plaintiff must demonstrate by a preponderance of the evidence that every limitation in the properly construed claim "reads on" the accused device, that is, whether the accused device falls within the scope of the claimed invention.[215] Because "[a] patent is infringed if a single claim is infringed," [216] the Court has individually

---

**211.** The Court has previously ruled that Lucent's counterclaim for declaratory judgment is equitable in nature and does not impart a right to trial by jury (docket no. 85 at 5). In any event, and in deference to the Federal Circuit law on this question, Lucent offered to withdraw its counterclaim in order to secure consolidation of the preliminary injunction hearing with the trial on the merits (docket no. 80 at 9). This offer was again renewed in post-hearing briefing (docket no.110 at 64 n.39). Accordingly, and since the Court has now *granted* consolidation, the Court considers Lucent's counterclaim to have been *dismissed without prejudice* on the motion of Lucent. It is settled that when there is no claim for damages, an affirmative defense of invalidity does not entitle a patentee to a jury. *See In re Lockwood,* 50 F.3d 966, 976 (Fed. Cir.), *cert. granted and judgment vacated,* 515 U.S. 1121, 115 S.Ct. 2274, 132 L.Ed.2d 279 (1995)("[I]f the patentee facing past acts of infringement nevertheless sought only to enjoin future acts of infringement, the patentee could only bring a suit in equity, and the defense of invalidity ordinarily would be tried

to the bench."). Further the parties agree that the defense of inequitable conduct before the USPTO is a matter to be decided by the Court. *See also* notes 282 and 292, below.

**212.** *Constant v. Advanced Micro–Devices, Inc.,* 848 F.2d 1560 (Fed.Cir.1988).

**213.** The Federal Circuit has indicated that a motion for summary judgment is as appropriate in a patent case as any other case when there is no genuine issue of material fact and movant is entitled to judgment as a matter of law. *E.g., C.R. Bard, Inc. v. Advanced Card. Sys., Inc.,* 911 F.2d 670 (Fed.Cir.1990); *Howes v. Medical Components, Inc.,* 814 F.2d 638 (Fed.Cir.1987).

**214.** Barker Testimony, Tr. 159–61; Px 12A.

**215.** *Laitram Corp. v. Rexnord, Inc.,* 939 F.2d 1533, 1535 (Fed.Cir.1991).

**216.** *Intervet Am., Inc. v. Kee–Vet Labs.,* 887 F.2d 1050, 1055 (Fed.Cir.1989).

examined each of the asserted claims to determine whether they have been infringed by the accused device. Plaintiff in this case has not met its burden. The Court makes the following findings and conclusions in support of its ruling that plaintiff has not established likelihood of success on the merits of its claim of infringement, in compliance with Fed.R.Civ.P. 52(c) and Fed.R.Civ.P. 65(a)(2), and with respect to defendant's motion for summary judgment on infringement.

### a. *Virtual Telephone Does Not Provide Virtual Presence*

"Virtual presence," as defined in the '639 patent, requires, in sum, that the remote worker has the full capabilities of the corporate office and transparency to those dealing with the remote worker over the telephone or the data network.[217] Virtual Telephone does not provide either element.[218] Virtual Telephone does not provide virtual presence as defined in the '639 patent. Accordingly, summary judgment or, in the alternative, judgment may be entered in favor of Lucent on this issue.

#### *full capabilities of the PBX*

Virtual Telephone does not extend basic office PBX functions to the remote user, such as call transfer and conference calling. If a remote user can transfer a call or set up a conference call on the office telephone, these features cannot be dupli-

cated at the remote site using Virtual Telephone.[219]

Virtual Telephone cannot provide the full capabilities of the office PBX to the remote worker because the MMCX server is connected to the PBX in a different way from the way in which the VPS is connected as described in the '639 patent. An office PBX has two types of connections: trunk connections and extension connections. The office telephones are plugged into the extension connections. The trunk connections are used to connect the PBX to other telephone networks, such as another PBX or the PSTN.[220]

Unlike the VPS described in the '639 patent, the MMCX server is not attached as an extension on the PBX.[221] Rather, the MMCX server connects to a trunk connection on the PBX. As such, it cannot extend to the remote user the basic calling features provided to a telephone attached as an extension to the PBX, such as call transfer and conference calling. In fact, the MMCX server cannot even provide a dial tone from the PBX to the Virtual Telephone client.[222] Thus, the client cannot use "DTMF signaling" to remotely access features on the PBX.[223]

Dr. Weiss explained the difference between Lucent's system and the system described in the '639 patent as follows:

**217.** The patent describes the claimed invention as "provid[ing] a remote user with a virtual presence at the corporate office, including access to all of the facilities and features of the corporate office PBX and LAN" ('639 patent, col. 2, lines 13–16; *see also* col.1, lines 9–12; col. 2, lines 51–54).

**218.** Plaintiff argues that Lucent's "advertising materials" acknowledge that there is "no change in the caller's experience" in the use of Virtual Telephone. The Court has not considered advertisements in construing the claim term "virtual presence." To the extent that ads are relevant to summary judgment and judgment issues regarding infringement, marketing information about Virtual Telephone (*e.g.*, Px 86, LUC 52738 & 52739) is of limited probative value because it does not purport to describe the technical operation of

Virtual Telephone (*see, e.g.*, Katz Testimony, Tr. 1243–46).

**219.** Vidil Testimony, Tr. 1085–87. The hold feature offered by Virtual Telephone is not extended from the PBX but is programmed into the Virtual Telephone software (Dx 166, Vidil Decl. ¶ 35).

**220.** Dx 168, Katz Decl. ¶ 28; Vidil testimony, Tr. 1084–87; Weiss testimony, Tr. 1389–90.

**221.** *Compare* '639 patent, col. 5, lines 37–38 ("[t]he virtual presence server 106 located at the corporate office connects to the corporate PBX 112 as one or more extensions.").

**222.** Weiss testimony, Tr. 1085–87.

**223.** Dx 168, Katz Decl. ¶ 29; Dx 166, Vidil Decl. ¶ 35; Vidil testimony, Tr. 1084–87.

"[I]n the system represented by the patent, the [VPS] is sitting on an actual extension of the PBX. And because it's sitting on an extension of the PBX, it has the capability of all the features of the PBX. Any extension on the PBX can do hold and call forward and conference and park and all the other features that are available to any other extension. So, as far as the PBX is concerned, the VPS is just another extension, and . . . is capable of accessing and using all the features that are available on the PBX . . . .

[T]he connection between the MMCX and the PBX is not an extension but rather a trunk line. . . . Trunks are usually connected from one PBX to another PBX. What's important is that the trunk line is capable of much fewer control features of the PBX. For example, the trunk line can't do a hold, it can't do a transfer, it can't do a conference. And so because of that connection, the MMCX is not capable of exploiting the features of the PBX that an extension would have. And because the MMCX can't do it, clearly then the telecommuter who's working through MMCX doesn't have those features either. So, a telecommuter on the virtual telephone system would have very few telephone features and certainly couldn't exploit the full functionality of the PBX."[224]

Plaintiff's expert, Mr. Bradner, agreed that if Virtual Telephone does not extend of all the features of the PBX (including call transfer and conference calling), then it cannot provide "virtual presence."[225] Plaintiff's argument that Virtual Tele-

phone provides "virtual presence from at least the perspective of the remote users whose office phones only have hold buttons"[226] must be rejected. There are no facts in the record showing that any PBX only provides a "hold" feature or that an office user may be provided an office telephone that cannot access the features of a PBX.

### full capabilities of the LAN

Virtual Telephone does not extend the full capabilities of the LAN to a remote user. Virtual Telephone is a voice-only product. A client cannot run data applications (such as e-mail) through Virtual Telephone. To access data applications from a remote location, the user must bring up a separate application on the personal computer screen that has nothing to do with Virtual Telephone. The remote user could access data applications (such as e-mail) by connecting to the RAS without ever using the Virtual Telephone application.[227] Thus, Virtual Telephone has nothing to do with extending office data capabilities to the remote user. As such, it does not provide "virtual presence" regarding data to the remote user.

### transparency to callers

Virtual Telephone does not operate transparently to a person calling the remote user at the office. When a call is placed to the office phone of a Virtual Telephone client who is logged onto the MMCX server, the client's office phone will ring three or four times. The office PBX will then transfer the call to the MMCX server. At that point, the caller

**224.** Tr. at 1390–91.

**225.** Tr. 819–21. In opposing summary judgment, plaintiff argues that Mr. Bradner testified only that the remote worker should have the remote use of whatever PBX features are available to that worker when in the office—and not the full capabilities of the PBX (docket no. 108 at 4). The Court, as a matter of law in claim construction, has determined the definition of the term "virtual presence" requires the remote worker to have access to the full capabilities of the office PBX and, thus, distinguishes plaintiff's argument ('639

patent, col. 2, lines 13–16; *see also* col. 1, lines 9–12; col. 2, lines 51–54). To practice the '639 patent, the full capabilities of the PBX must be extended to the remote worker; whether the remote worker—in the office or remotely—chooses to take advantage of each feature is a matter not controlled by the patent.

**226.** Docket no. 104 at 25.

**227.** Dx 168, Katz Decl. ¶ 30; Vidil testimony, Tr. 1077–78.

may hear an audible tone (a "ring ping"). When the call is delivered to the MMCX server, the caller may also hear an audible ring back.[228] In addition, the display on the caller's telephone may change and indicate that the call is being forwarded to another location.[229]

Thus, a caller receives a number of signals that inform the caller that the Virtual Telephone client is not answering his or her office telephone. Indeed, the office PBX provides many of those signals to inform the caller that the call is being transferred to another location. These signals far exceed the display on the caller's telephone that, as discussed above, might also exist in implementation of the '639 patent. A breach in the transparency of the '639 patent is caused when the caller—in a circumstance not controlled by the claims of the patent—has a display telephone. On the other hand, even if a display telephone is not used by a caller to a Virtual Telephone client, the outside caller will always receive a number of signals that the call is being transferred inherent to the operation of Virtual Telephone and, thus, the transparency taught in the '639 patent will always be breached in Virtual Telephone:

First, the call will ring three or four times at the remote user's office before it is sent to the MMCX server, indicating that the called party is not in the office.[230]

Second, the caller hears an audible tone—a "ring-ping"—when the call is transferred to the MMCX server that alerts the caller to the fact that the call is being forwarded.[231]

Third, even when the PBX does not support a ring-ping, there would still be an "audible ring-back" that would alert the caller that the called party (i.e., the remote user) was not at the corporate office telephone.[232]

The operation of Virtual Telephone was demonstrated to the Court.[233] The demonstration showed that when a call comes to the office telephone of a Virtual Telephone client, the telephone rings three or four times before it is forwarded to the MMCX server. At that point, there is a noticeable audible change in the ring of the telephone. In addition, the display on the caller's telephone shows that the call has been transferred to a new location.[234] The ring pattern and audible changes are signals that the call is transferred.[235]

Virtual Telephone does not operate transparently to a person calling the re-

228. Katz testimony, Tr. 1248.

229. Dx 168, Katz Decl. ¶ 26; Katz testimony, Tr. 1247–48; Vidil Testimony, Tr. 1079; Dx 169.

230. Tr. 1079.

231. Katz testimony, Tr. 1247–48; Weiss testimony, Tr. 1389.

232. Katz testimony, Tr. 1282; Weiss testimony, Tr. 1425.

233. Defendant's Exhibit 169 is a videotape demonstration, prepared by Lucent's counsel, of MMCX Release 3.0 with the Virtual Telephone application and MMCX Release 1.0 with the original Virtual Conference Room application.

234. DX 169.

235. Mr. Bradner testified in a declaration submitted in opposition to defendant's motion for summary judgment that neither the information on the visual display nor the "audible anomalies" would be understood subjectively by Bradner as signals a call is being transferred (docket no. 108, ex. 1 at 3). Dr. Weiss, on the other hand, testified at the hearing that those signals would indicate to him that a call is being transferred (Tr. 1389). Thus, plaintiff has set up a disputed issue of fact regarding the subjective understanding of signals accompanying a call transfer or, arguably, the materiality of objective signals. There is no dispute, as an objective matter, that such signals do occur when a call is transferred to a Virtual Telephone client. Further, in claim construction, it has been determined that the "transparency" component of "virtual presence" requires that a person calling the corporate office for the remote worker is connected to the remote worker without being able to perceive that the remote worker was not in the corporate office. This formulation of "virtual presence" refers to objective factors and does not depend on the subjective understanding of a particular caller.

**732**

mote user at the office because the MMCX server operates in a different way from the way in which the VPS operates as described in the '639 patent. With Virtual Telephone, the PBX must be administered using call coverage to direct all calls to the MMCX server when the office telephone is not answered. The PBX must also be administered to send the call to the next location in the coverage path (such as voicemail) if the Virtual Telephone client is not logged into the MMCX server. The PBX administration must be done manually at the corporate office before the remote user can use the Virtual Telephone application.[236]

The system described in the '639 patent uses remote call forwarding to transfer calls from a remote user's office telephone to the VPS. When the remote user logs onto the VPS, the VPS instructs the PBX to send all calls that are intended for the remote user's office telephone to an extension connected to the VPS:

> After validation in step 532, in step 534 the [VPS] 106 transfers a message to the corporate PBX 112 to [initiate] remote call forwarding. The [VPS] 106 issues a command to the PBX 112 regarding the virtual presence of the remote user. It is noted that this command to the PBX 112 may be issued automatically or manually. The command includes the instruction to forward all telephone calls to the extension of the remote user to the location of the remote user at his "virtual office."

> If the PBX 112 supports remote call forwarding, the [VPS] 106 issues a sequence of tones, and hookflash if needed, on the line to the PBX 112 that direct the PBX 112 to forward the remote

user's extension to the remote user's actual location.[237]

Thus, when a call is received by the PBX, it does not ring at the remote user's office phone, but is automatically forwarded to the remote user through the VPS. As such, the caller does not notice that the call is being sent to the remote user at a different location.[238] That is what makes it "transparent" to a caller that the remote worker is not in the corporate office.

When the remote user disconnects from the VPS, the VPS instructs the PBX to "unforward" the remote user's office phone: "In other words, the [VPS] 106 automatically sends a message to the console to forward future messages back to the user's corporate office extension."[239]

The VPS is able to use remote call forwarding and instruct the PBX to forward calls to the remote user because, as noted above, it is connected as an extension to the PBX. When a telephone is attached as an extension to the PBX, it can send a signal to the PBX to forward calls. As described above, that is how the VPS is able to instruct the remote user's office telephone to forward calls to the remote user. By contrast, because the MMCX server is attached to the PBX through a trunk connection, it cannot send signals to the PBX and instruct it using remote call forwarding nor, since it is not connected to the PBX as an extension, could it ask the PBX to forward calls to it, as the VPS does. With the Virtual Telephone system, the PBX must be manually administered with call coverage before the Virtual Telephone client ever logs onto the MMCX server to send calls from the client's office phone to the MMCX server. Call coverage is not functionally the same as call forwarding.[240]

**236.** Dx 168, Katz Decl. ¶ 14; Vidil testimony, Tr. 1079.

**237.** '639 patent, col. 19, lines 5–18.

**238.** Weiss testimony, Tr. 1387–88.

**239.** '639 patent, col.19, lines 57–60.

**240.** Plaintiff's counsel asked Mr. Vidil whether the PBX in the Virtual Telephone system

could be manually administered with call forwarding instead of call coverage. Vidil testified that such a system would not be desirable. With call forwarding, a telephone call is sent from one number to another without ever ringing at the first number. If the call is not answered, then it rings forever at the second number. As Vidil testified, the PBX is not administered to send the call to the MMCX server using call forwarding because,

In sum, there is no genuine issue of material fact that the full capability of the office PBX are not extended to the remote worker using Virtual Telephone. Because Virtual Telephone does not provide "virtual presence," it does not infringe the '639 patent.

### b. *Virtual Telephone Does Not Have The Connections Described In The '639 Patent*

As discussed, claim 1 of the '639 patent describes three distinct connections: (1) a connection from the user communications device at the remote site to the VPS at the corporate office through the transmission media (such as the PSTN); (2) a connection from the VPS to the telephony server (such as the PBX); and (3) a separate connection from the VPS to the LAN.[241]

Mr. Bradner agreed that the following figure accurately represented the connections described in claim 1:[242]

Claim _1_

DATARACE029

Claim 14 describes the same connections.

if the Virtual Telephone client is not logged onto the server, then the PBX would have no other destination to which to direct the call and the call would "ring forever" (Tr. 1164–65). Thus, the Virtual Telephone system uses call coverage because if the Virtual Telephone client is not logged onto the MMCX server, the PBX can send the call to another destination. The MMCX server cannot use remote call forwarding to instruct the PBX to for-

Claim 39 describes the first connection listed above. The following diagram depicts the connections in claim 39:[243]

ward calls whenever the Virtual Telephone client logs onto the MMCX server and then to un-forward the calls when the client logs off.

**241.** '639 patent, col. 25–26.

**242.** Dx 165; Tr. 955.

**243.** Dx 164.

Claim 39

Mr. Vidil described the connections required for Virtual Telephone as follows: [244]

**244.** Dx 167; Tr. 1072–75.

**DEFENDANT'S EXHIBIT 167**
SA98-1A-746

### the connections to the MMCX server

With Virtual Telephone, the first connection described above does not exist. The MMCX server is not connected to the transmission media. In addition, it does not have a "virtual presence server communication device" (*e.g.*, a modem) that would allow the remote user to dial the MMCX server and establish a connection with the server through the transmission media. Rather, the MMCX server is only connected to the LAN and the PBX.[245]

To use the Virtual Telephone application, a remote user must first log onto the LAN through a RAS. The MMCX server and its Virtual Telephone application are not used to establish a connection to the LAN through the RAS. After the client logs onto the LAN through the RAS, the client is free to access any of the LAN's servers and their associated applications, not just MMCX and its telephony applications. If the client wishes to log onto the MMCX server and run the Virtual Telephone application, he or she must separately log onto MMCX server. Thus, the remote user accesses and communicates with the MMCX server through the LAN, not through the PSTN.[246] Claims 1, 14, and 39 of the '639 patent expressly require a connection between the remote user and the VPS through the transmission media. Virtual Telephone does not have such a connection.

The MMCX server with the Virtual Telephone application is connected differently from the way in which the system described in the '639 patent is connected. Unlike the system described in the '639 patent, Virtual Telephone is a "voice over Internet Protocol (IP)" product. It turns voice signals into data packets and places those data packets on the LAN where they are treated by the LAN like any other data traveling on the LAN. Thus, the Virtual Telephone system works by turning

---

245. Dx 168, Katz Decl. ¶ 19; Dx 100; Vidil testimony, Tr. 1072–75.

246. Dx 167; Dx 168, Katz Decl. ¶¶ 17–19; Vidil testimony, Tr. 1076–78; Weiss testimony, Tr. 1383–84.

voice signals into bits of data and placing the digitized voice on the LAN with an IP address. The digitized voice is routed by specialized computers on the LAN (called routers) just like e-mail or any other data is routed on the LAN. The remote user accesses the voice call in the same way it accesses any data on the LAN.[247]

In contrast to MMCX with its Virtual Telephone application, the system described in the '639 patent is not a voice over IP product. Rather, the remote user establishes a connection to the VPS, which is connected to the PBX. The VPS instructs the PBX to forward calls directly from the PBX to the remote user. It can do that because there is a direct connection between the remote user and the VPS through a transmission medium (*e.g.*, the PSTN) and through a virtual presence server communication device (a modem).[248] Thus, the call never touches the LAN. It does not turn those calls into digitized packets and place an IP address on the packets. The remote user does not receive the calls through the LAN. As Dr. Weiss testified, "for the '639 patent, the LAN is not involved at all in voice."[249]

### *the combination of the RAS and the MMCX server*

Plaintiff's expert, Bradner, attempts to demonstrate that the MMCX server with the Virtual Telephone application contains the connections described in the '639 patent by arguing that the RAS can be combined with the MMCX server to form the VPS.[250] But, as shown in figure 2 of the '639 patent, even if the corporate office includes a RAS, the VPS server nonetheless connects directly to the transmission media. The connection to the VPS is not through the RAS. The '639 invention does not place voice communications from the

PBX onto the LAN. Therefore, the remote user must dial into the VPS to access the PBX.

Moreover, the system described in the '639 patent is not a voice over IP system. It does not digitize voice communications and route those communications like they were data over the LAN. Thus, the RAS described in the '639 patent is used only with data and has no function with respect to voice, unlike the RAS in the Virtual Telephone system which routes both packetized voice and data. Indeed, figure 2 of the '639 patent does not show the remote user accessing the VPS through the RAS because the VPS in the '639 patent could not route voice communications from the PBX to the remote user with such a configuration. The remote user must log directly into the VPS to access the PBX.

Mr. Bradner's suggestion that the RAS can be combined with the MMCX server to form the VPS is also based on the assumption that, with "modern computers," it is easy to combine different functions in a single box.[251] But, the MMCX server and the RAS are configured differently, perform different functions and cannot be placed in "the same box" (as plaintiff suggests) without making substantial changes to the MMCX server.[252] The '639 patent is clear that even when a RAS is used with the VPS, the remote user must nonetheless connect to the VPS through the transmission media. In addition, the RAS and MMCX server perform different functions and cannot be readily combined into a "single box." Because the MMCX server and RAS are connected by and communicate over the LAN, combining the MMCX with the RAS would mean that the LAN,

**247.** Dx 166, Vidil Decl. ¶9; Dx 168, Katz Decl. ¶23; Vidil testimony, Tr. 1076–78; Weiss testimony, Tr. 1385–86.

**248.** Weiss testimony, Tr. 1386–87.

**249.** Tr. 1384–85 ("for the '639 patent, the LAN is not involved at all in voice").

**250.** Tr. 745, 747, 752–53.

**251.** Tr. 698.

**252.** Vidil testimony, Tr. 1170–72. Mr. Katz testified that, at present, the only way to place the MMCX and the RAS in the same box would be to "build sheetmetal around them" (Tr. 1235–36).

too, would be part of the VPS, a concept with no basis in the '639 patent.

In sum, there is no genuine issue of material fact that Virtual Telephone does not have the same connections as the '639 patent. Because the connections are materially different, Virtual Telephone does not infringe the '639 patent.

### c. Virtual Telephone Does Not "Route" As That Term Is Used In The '639 Patent

Virtual Telephone does not "route" voice or data communications as that term is used in the '639 patent. The MMCX server does not choose an appropriate destination from two or more possibilities and direct based on that choice. Indeed, the MMCX server has only a connection to the PBX and a connection to the LAN.

As noted above, as to data, it is undisputed that Virtual Telephone has no role. The '639 patent requires that the VPS be capable of routing data communications to the remote user and the MMCX server, when used with the Virtual Telephone application, does not even handle—much less route—data.

As to voice, the Virtual Telephone has no choice about what to do with a voice message it receives from the PBX for a remote user. When it receives a call from the PBX, it does not choose between different destinations for that call and direct the call to appropriate destination based on that choice; rather, it places all information it receives from the PBX on the LAN.[253]

The MMCX server turns the call from the PBX into data packets, places an address on them, and places the packets on the LAN. The call is routed to the remote user by "routers," devices on a LAN that direct data, and ultimately by the RAS. The RAS receives the data packets from the LAN, reads the address on the packets and sends them to the appropriate remote user.[254] Thus, the routers and RAS route communications to the remote user, not the MMCX server.[255] If the "routing" requirement of the patent were satisfied by combining the MMCX server with the RAS, then every device that routes data on a LAN would be included as part of the VPS, a construction which the Court does not adopt.

As Dr. Weiss explained, the MMCX server is similar to a person who addresses an envelope and places it in a mail box. That person does not route the letter to its destination. Rather, the postal system reads the address and routes. Similarly, with Virtual Telephone, the MMCX server does not route communications. Other devices on the LAN route the packetized voice communications by reading the address information and directing the packets along the correct path to the appropriate remote user.[256]

The VPS described in the '639 patent has a number of modems ("virtual presence server communication devices") for connecting to the transmission media and a number of lines connected to the PBX as extensions. It also connects to the LAN. When the VPS receives a communication from the PBX or the LAN intended for the remote user, it routes the communication to the remote user by choosing the appropriate modem and directing the communication to that modem. By contrast, the MMCX server does not have modems that allow remote users to connect to it through the transmission media. Rather, it has only a connection to the LAN and the PBX. If it receives two calls from the PBX intended for different remote users, it "packetizes" the calls and sends them to the same place, the LAN. The MMCX does not route calls.

---

**253.** Dx 175, Weiss Decl. ¶¶ 11–12; Weiss testimony, Tr. 1396–97.

**254.** Weiss testimony, Tr. 1396–97.

**255.** Dx 168, Katz Decl. ¶¶ 20–24; Katz testimony, Tr. 1237–38; Vidil testimony, Tr. 1117–18; Literati testimony, Tr. 1358; Weiss testimony, Tr. 1396.

**256.** Weiss testimony, Tr. 1395–96.

In sum, there is no genuine issue of material fact that Virtual Telephone has no role regarding data and that Virtual Telephone places all "packetized" calls on the LAN which does not equate to "routing" as that term has been defined in the '639 patent. Because the MMCX server does not perform any routing in the Virtual Telephone application, Virtual Telephone does not infringe the '639 patent.

### d. *Virtual Telephone Does Not Use Identification Information As Required By The '639 Patent*

As noted above, "identification information" must have all of the following characteristics: (1) the identification information must be "of said user communications device;" (2) it must be received by and provided to the virtual presence server from the user communications device; (3) it must be used to determine if a communication from the LAN or PBX is intended for the remote user; (4) it must be used by the VPS to route communications received by the LAN or PBX which are intended for the user communications device to the remote user communications device; *and* (5) it must provide the identity of the remote user.[257]

Virtual Telephone does not use "identification information" as that term is used in claims 1 and 39 or "address information" as that term is used in claim 14. The only session-specific information received and stored by the MMCX server regarding a remote user is an IP address.[258] Plaintiff contends that "identification information" includes an IP address.[259] Although one with ordinary skill in the art would consider "identification information" as including an IP address, an IP address standing by itself does not meet the criteria for identification information.[260]

First, in Virtual Telephone, the IP address is not "of said user communications device" as that term is used in the '639 patent. Virtual Telephone uses a temporary IP address that is assigned by the RAS when the remote user connects to the RAS.[261] The temporary IP address is not generated by the remote user's communication device.[262] It becomes associated with the user communication device by the MMCX server only after the RAS assigns the IP address to the remote user.[263]

Second, under plaintiff's reading of the '639 patent, the IP address is not received by and provided to the VPS from the user communications device.[264] The '639 patent is clear that the VPS does not have the "identification information" before the user communications device (*i.e.*, the remote computer) dials the VPS, establishes a connection and provides that information to the VPS. Indeed, claim 1 states that the VPS must have "a memory for storing said identification information received from said user communications device," indicating that it stores the information only after it is received by the remote computer.[265] In Virtual Telephone, the IP address does not originate from the user communication device but from the RAS. Assuming, *arguendo*, that the RAS and the MMCX server combined equal the

---

**257.** Dx 174; Tr. 912–17.

**258.** Weiss testimony, Tr. 1399.

**259.** Docket no. 104 at 14, 27.

**260.** Bradner testimony, Tr. 928–30; Weiss testimony, Tr. 1506, 1508–09.

**261.** Vidil testimony, Tr. 1077; Dx 168, Katz Decl. ¶ 16. Plaintiff concedes that "when a ... [RAS] ... is used by the remote user to connect with the corporate LAN, the RAS dynamically assigns that user an IP address" (docket no. 61 (Data Race's claims construction statement) at 14).

**262.** Dx 175, Weiss Decl. ¶ 17.

**263.** Weiss testimony, Tr. 1402–03.

**264.** Alternatively, if the RAS is not combined with the MMCX server to create a "VPS," then the IP address is provided by the user communication device to the MMCX server. As Dr. Weiss explained, the IP address is generated by the RAS, communicated to the remote user's computer, and then communicated by the remote user to the MMCX server when the remote user logs onto that server (Tr. 1402–03).

**265.** '639 patent, col. 25, line 50–51.

VPS, then the IP address still would not be generated by the user communication device but would be generated by the VPS (*i.e.*, the RAS component of the VPS).

Third, the facts are undisputed that the temporary IP address used by Virtual Telephone does not provide the identity of the remote user.[266] As noted above, plaintiff's expert, Mr. Bradner, conceded that an IP address alone could not perform the functions described in the '639 patent for identification information.[267] Mr. Bradner, testified that an IP address can provide the identify of the remote user and function as "identification information" within the meaning of the '639 patent if it is "bonded" to or associated with the user's name.

In addition, the remote user's log-in name, password, and office phone number are programmed into the MMCX server before the remote user can access the server.[268] The MMCX server possesses that information before the remote user logs onto the server. As Dr. Weiss testified, the "only session-specific information that [the MMCX server] stores, that is, the new information that it stores as a result of creating a new remote session, is the IP number of the remote machine."[269] The '639 patent is clear that "identification information" is new information provided by the remote user and stored by the VPS. Thus, in the Virtual Telephone system, a user's log-in name cannot be part of the "identification information" described in the '639 patent because the log-in name is not session specific information that is stored by the MMCX server.

Fourth, the MMCX does not use the IP address to route voice or data. It is not used to route data because the MMCX in Virtual Telephone is not involved with data. The IP address is not used to route voice because the MMCX affixes the IP address to voice communications from the PBX only after it determines that the remote user is logged onto Virtual Telephone such that the call should be placed on the LAN.[270] Then, Virtual Telephone "packetizes" the call and affixes an IP address to the packets and places all of the packets on the LAN. Thus, the IP address is not used by the MMCX to determine whether the call is intended for the remote user in the first place.

In sum, there is no genuine issue of material fact that the temporary IP address used in Virtual Telephone is not "identification information" as that term has been defined in the '639 patent. Because the IP address used in Virtual Telephone is not "identification information," Virtual Telephone does not infringe the '639 patent.

### e. *Summary*

■ For all of the foregoing reasons, Lucent is entitled to entry of summary judgment or, in the alternative, judgment on the issue of direct infringement. Specifically, even if there are questions which implicate factual disputes not properly addressed on summary judgment, there is no genuine issue of material fact that: (a) Virtual Telephone does not and cannot extend the full capabilities of the office PBX to the remote worker; (b) Virtual Telephone uses voice over IP technology and an IP address which is at the heart of Virtual Telephone cannot, by itself, meet the requirements of "identification infor-

---

**266.** Dx 175, Weiss Decl. ¶ 17. The examiner said that "the identification information is the identity of the user operating the remote communication device" (Dx2 at 3; Tr. 941–42).

**267.** Tr. 929–30. As noted above, the device described in the '639 patent does not "packetize" voice communications and place them on the LAN. Thus, with respect to the device described in the '639 patent, an IP address does not meet the third and fourth criteria for "identification information" since it cannot

be used to determine if a communication from the PBX is intended for the remote user and it cannot be used to route communications received by the PBX to the remote user communications device.

**268.** Dx. 168, Katz Decl. ¶ 12.

**269.** Dx 175, Weiss Decl. ¶ 18 and Weiss testimony, Tr. 1399.

**270.** Dx 175, Weiss Decl. ¶ 19.

mation" specified in the '639 patent; and (c) Virtual Telephone does not have the three distinct connections described in claims 1, 14 and 39 of the '639 patent.[271] The Court finds that none of the asserted claims in the '639 patent is literally infringed by the accused device. Accordingly, summary judgment and judgment should be entered in favor of defendant on the issue of literal infringement.

### 2. *Doctrine of Equivalents*

Plaintiff argues that Virtual Telephone infringes the '639 patent under the doctrine of equivalents. The Court notes that the motion for preliminary injunction never mentioned the doctrine of equivalents. Data Race did not expressly present any evidence or argument at the preliminary injunction hearing that Virtual Telephone contains an equivalent for each element of the '639 patent even though it represented that, except for damages, it intended on presenting no additional evidence at a trial on the merits.[272] Therefore, there would be justification for simply not considering infringement under the doctrine of equivalents.

■■■■ The doctrine of equivalents exists in order to prevent infringers from stealing the heart of an invention but escaping liability by making minor or insubstantial changes to the literal language of the claims. Infringement under the doctrine of equivalents occurs if every limitation of the asserted claim or its equivalent is found in the accused product or process and the equivalent differs from the claimed invention only insubstantially.[273] Equivalence is a question of fact.[274] In address-

ing the substantiality of any differences, the test is often whether the accused product "performs substantially the same function in substantially the same way to achieve substantially the same result" as the patented invention.[275] There are two major limitations on using the doctrine of equivalents to allow a patent owner a broader right to exclude than is given by the literal language of the claims: inventions in a crowded field are often restricted to a narrow range of equivalents, if any;[276] and a patent owner can be estopped from benefitting from the doctrine of equivalents as a result of prosecution history estoppel.

■■■■ Assuming that plaintiff is entitled to assert infringement under the doctrine of equivalents, and for the reasons discussed in greater detail above, the Court finds and concludes that Virtual Telephone does not function in substantially the same way to obtain the same result as any of the asserted patent claims. Specifically, there are substantial differences between Virtual Telephone and the elements of virtual presence, routing, identification information and connections. Plaintiff's argument that the MMCX server and the RAS could be placed in the same box and perform the same functions as the VPS is contrary to the record. There is no genuine issue of material fact that the MMCX server and the RAS operate in a substantially different way in which the VPS operates. The MMCX uses "voice over IP" technology to transmit voice to and from the remote user; whereas, the VPS instructs the PBX to send calls to the remote user but the

---

**271.** Sworn testimony about the meaning and application of various phrases of a claim does not necessarily create a factual dispute that precludes summary judgment on infringement. *Townsend Engineering Co. v. HiTec Co.*, 829 F.2d 1086 (Fed.Cir.1987).

**272.** Tr. 1088–92.

**273.** *Warner–Jenkinson Co.*, 520 U.S. at 39–40, 117 S.Ct. 1040; *Ethicon Endo–Surgery, Inc. v. United States Surgical Corp.*, 149 F.3d 1309, 1315 (Fed.Cir.1998).

**274.** *Graver Tank & Mfg. Co. v. Linde Air Prods., Co.*, 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950) quoted in *Southwall Technologies, Inc.*, 54 F.3d at 1579. *See also Warner–Jenkinson Co.*, 520 U.S. at 38–39, 117 S.Ct. 1040.

**275.** *Warner–Jenkinson Co.*, 520 U.S. at 39–40, 117 S.Ct. 1040; *Hughes Aircraft Co. v. United States*, 140 F.3d 1470, 1474 (Fed.Cir.1998).

**276.** *Hughes Aircraft Co. v. United States*, 717 F.2d 1351 (Fed.Cir.1983).

calls are not turned into data, do not "touch" the LAN and do not pass through the RAS. In addition, the MMCX server and the RAS do not achieve the same results as the VPS because the MMCX does not extend the full functionality of the PBX to the remote worker and does not provide transparency to outside callers.

When Data Race obtained the '639 patent, the field was already occupied with devices designed to allow a remote worker to have access to voice and data. Indeed, such matters as the use of IP addresses and the nature of connections were areas which Data Race successfully emphasized in distinguishing the prior art when obtaining the patent. The differences between the '639 patent and Virtual Telephone application are not insubstantial. Judgment should be entered in favor of defendant on the theory of infringement under the doctrine of equivalents.

Based upon all of the foregoing reasons, none of the asserted claims of the '639 patent is infringed by Virtual Telephone, either literally or under the doctrine of equivalents. Plaintiff has failed to prove its *prima facie* case of infringement by a preponderance of the evidence.

### G. *Lucent's Defenses*

#### 1. *Validity Analysis*

■ The Court has found non-infringement but has not yet addressed the question of validity of the '639 patent. Defen-

dant argues that the "better practice" is to inquire fully into both infringement and validity when both are raised in a case.[277] But, it is not always necessary to do so.[278] Although the United States Supreme Court has overturned the Federal Circuit's former practice of vacating on appeal validity findings following rulings of non-infringement,[279] the Supreme Court "stressed the limited nature of the ruling, reviewing the appellate practice but not any trial-level conventions of finding a validity determination moot upon non-infringement."[280] The Federal Circuit has noted that a trial court still has the discretion not to address validity when non-infringement is clear and invalidity is not plainly evident.[281] Indeed, the Federal Circuit has upheld the dismissal as moot of a counterclaim asserting invalidity and unenforceability in light summary judgment of non-infringement.[282] Consequently, the Court is not automatically required to address further defendant's defenses to liability.

In this case, Data Race has not met it burden of establishing its own case against defendant based on infringement. Therefore, there is no reason to address defendant's defenses to liability. Further, the invalidity of the patent in suit is not "plainly evident." Therefore, the Court concludes it is appropriate not to further address the defenses of invalidity and unenforceability. "The court believes that

277. *Sinclair Co. v. Interchemical Corp.,* 325 U.S. 327, 65 S.Ct. 1143, 89 L.Ed. 1644 (1945).

278. *Dresser Indus., Inc. v. United States,* 193 Ct.Cl. 140, 432 F.2d 787 (1970).

279. *Cardinal Chem. Co. v. Morton Int'l, Inc.,* 508 U.S. 83, 113 S.Ct. 1967, 124 L.Ed.2d 1 (1993)("[T]he issue before us, therefore concerns the jurisdiction of an intermediate appellate court—not the jurisdiction of either a trial court or this Court.").

280. *Messerschmidt v. United States,* 29 Fed. Cl. 1, 16 (1993).

281. *Phonometrics, Inc. v. Northern Telecom, Inc.,* 133 F.3d 1459, 1468 (Fed.Cir.1998).

282. *Id. See also Nestier Corp. v. Menasha Corp.—Lewisystems Div.,* 739 F.2d 1576, 1580–81 (Fed.Cir.1984), *cert. denied,* 470 U.S. 1053, 105 S.Ct. 1756, 84 L.Ed.2d 819 (1985) (district court did not abuse discretion in withholding judgment of invalidity despite jury's finding that the patent was "not invalid" when non-infringement is clear and invalidity is not "plainly evident"). In this case, as noted above, defendant's counterclaim was withdrawn as part of its position in seeking to consolidate the preliminary injunction hearing with a trial on the merits. The holding of *Nestier Corp.* would further support the dismissal of that counterclaim as moot.

this is also appropriate given the presumption that an issued patent is valid, 35 U.S.C. § 282, and especially since, in the instant case, 'non-infringement is clear and invalidity is not plainly evident.' " [283] Even if the Court were to conclude that Lucent has failed to prove invalidity, the Court may conclude only that the patent has not been proven invalid, not that the patent is valid, because the patent is presumed to be valid.[284] The Court's decision not to consider the defenses effectively limits the collateral estoppel effect of this case on the question of the validity of the '639 patent.[285]

A patent is presumed to be valid.[286] Each claim of a patent is presumed valid independent of the validity of the patent's other claims.[287] The presumption of validity is never destroyed.[288] Absent evidence to the contrary, a court presumes not only novelty, § 102(g), non-obviousness, § 103 and lack of anticipation, § 102(a), but also that the patent adequately reveals the enablement, properly provides a written description and the best mode, § 112, ¶ 1, and contains the requisite definiteness of claims, § 112, ¶ 2. The presumption of validity is not weakened merely because material references not considered by the USPTO are introduced at trial.[289] The burden on Lucent is to show by clear and convincing evidence that the patent is invalid.[290]

Lucent strives to rebut the statutory presumption favoring validity,[291] arguing in opposition to the preliminary injunction that the '639 patent is invalid because the claimed invention is: not a new invention pursuant to § 102(g); obvious in light of the prior art pursuant to § 103; anticipated by the prior art pursuant to § 102(a); invalid for indefiniteness of claims, § 112, ¶ 2; and invalid for failing to provide a written description of identification information in violation of § 112, ¶ 1.[292] Further, Lucent argues that claims 1 and 14 are invalid because they are stated as apparatus claims but, instead, are method claims.[293] Specifically, Lucent has moved for summary judgment on two bases: Lucent conceived of MMCX before Data Race conceived of its claimed invention under § 102(g); and that the claimed invention is invalid for obviousness in light of the prior art under § 103.[294] Data Race, on the other hand, has moved for partial summary judgment on three of Lucent's affirmative defenses: anticipation under § 102(a); prior invention under § 102(g);

**283.** *McCreary and ALD, Inc. v. United States,* 35 Fed.Cl. 533, 568 (1996) quoting *Messerschmidt v. United States,* 29 Fed.Cl. at 17.

**284.** *Stratoflex, Inc. v. Aeroquip Corp.,* 713 F.2d 1530, 1534 (Fed.Cir.1983).

**285.** *Blonder–Tongue v. University Foundation,* 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971).

**286.** 35 U.S.C. § 282.

**287.** *Id.*

**288.** *Stratoflex, Inc.,* 713 F.2d at 1534.

**289.** *SSIH Equipment S.A. v. United States Int'l Trade Comm.,* 718 F.2d 365, 375 (Fed.Cir. 1983).

**290.** *Hybritech, Inc.,* 802 F.2d 1367.

**291.** Additionally, there is a presumption in favor of, or deference granted to, the findings of the USPTO. *American Hoist & Derrick Co. v. Sowa & Sons, Inc.,* 725 F.2d 1350, 1358–59 (Fed.Cir.), *cert. denied,* 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984); *In re Etter,* 756 F.2d 852, 861 (Fed.Cir.)("Our precedent holds that the presumption of validity is not weakened or destroyed during litigation by presentation of more relevant art not considered by the PTO, but may be more easily overcome if such art is presented."), *cert. denied,* 474 U.S. 828, 106 S.Ct. 88, 88 L.Ed.2d 72 (1985).

**292.** Docket no. 111. Lucent's answer pleaded invalidity of the patent as an affirmative defense (docket no. 29 at ¶ 19). Invalidity also was raised in the counterclaim which is not further considered (*id.*).

**293.** Docket no. 111.

**294.** Docket no. 110. Lucent also has requested summary judgment due to inequitable conduct before the USPTO, an issue discussed further below.

and enablement and definiteness under § 112.[295]

As noted, the Court considers moot the portions of defendant's motion for summary judgment that concern invalidity of the '639 patent and the plaintiff's motion for partial summary judgment. Nevertheless, to complete the record regarding plaintiff's preliminary injunction burden of proving reasonable likelihood of showing that Lucent is not able to establish invalidity and to support the Court's conclusion that invalidity is not "plainly evident," the Court undertakes the following brief discussion of the issues presented regarding invalidity of the '639 patent.

*prior invention, § 102(g)*

Lucent argues, both in opposition to issuance of the preliminary injunction and in its summary judgment motion, that Lucent's own MMCX product anticipates the '639 patent under § 102(g). Data Race has moved for partial summary judgment arguing that there is no genuine issue of material fact that Lucent's MMCX is not a prior invention.

■ Under § 102(g), when two parties claim to have invented the same subject matter, priority of invention goes to the first party to reduce the invention to practice unless the other party is able to show that it was the first to conceive the invention and that it exercised reasonable diligence in reducing the invention to practice.[296] As with other types of anticipation, prior invention under § 102(g) is a ques-

tion of fact that requires proof, by clear and convincing evidence, that each element of the claimed invention is found in the asserted reference of prior art.[297] As noted, the challenger bears the burden of proof.

Lucent argues that the MMCX with the Virtual Conference Room application was fully functional in July 1994 in the McDonald's trial,[298] which constitutes a reduction to practice or remote access to a central office by a worker in a branch office before the invention of the '639 patent. Lucent specifically contends that if "Virtual Telephone infringes the claims of the '639 patent ... the Court must also find the '639 patent invalid because MMCX was invented first and therefore anticipates the patent."[299] Lucent emphasizes that "[t]his argument does not imply that Lucent believes that MMCX actually contains each element of the '639 patent; it does not."[300] Rather, Lucent argues specifically that *if* interpretation of the '639 claims entails finding that each element is infringed, *then* the MMCX must be considered to be a prior invention.

Lucent publicly announced and demonstrated MMCX, release 1.0 on October 30, 1995.[301] MMCX release 1.0 through release 2.0 made possible desktop video conferencing and software application sharing through a "virtual conference room." MMCX release 3.0 contains the same basic functions as MMCX releases 1.0 through 2.1.[302] No version of MMCX allows the

**295.** Docket no. 102.

**296.** *Mahurkar v. C.R. Bard, Inc.,* 79 F.3d 1572, 1577 (Fed.Cir.1996).

**297.** *Hybritech, Inc.,* 802 F.2d at 1369; *Price v. Symsek,* 988 F.2d at 1194–95.

**298.** In the time period of the McDonald's trial, MMCX was called MMCS. The name of MMCS was changed to MMCX in 1995 for marketing reasons (Tr. 1193–96). For convenience, the product is referred to as MMCX throughout this Order.

**299.** Docket no. 110 at 21.

**300.** *Id.* at n. 18. Indeed, Lucent's proposed findings of fact and conclusions of law, docket no. 111 at 15–18, appear to reflect that the McDonald's trial did not include all of the elements of the invention set forth in the '639 patent.

**301.** Dx 89.

**302.** Only three changes were made to release 2.1 in order to add Virtual Telephone: the addition of a voice compression card (Dx 166, Vidil Decl. ¶¶ 24, 33); the addition of a graphical user interface (Dx 166, Vidil Decl. ¶ 34), and the activation of hold and multiple call features as local features in the remote user's device (Dx 166, Vidil Decl. ¶ 35).

remote user to act as a remote extension of the PBX.[303] Under a proper construction of the claims, the ability to establish a "virtual presence" at the corporate office requires access to the full range of PBX features.[304]

For the reasons noted in this Order, the Court has found and concluded that MMCX, release 3.0, with the Virtual Telephone application does not infringe the disputed claims of the '639 patent because the MMCX with the Virtual Telephone application does not contain each element of the '639 patent. Moreover, as noted above, there are no genuine issues of material fact that MMCX with Virtual Telephone does not extend the full capabilities of the PBX, does not use "identification information" to route communications as specified in the '639 patent and does not have the three distinct connections described in the '639 patent. Therefore, the Court cannot conclude that it is "plainly evident" that the MMCX release 1.0 was a "first invention" within the meaning of § 102(g).[305] Although the record might indeed show that MMCX release 1.0 was a first invention if the MMCX release 3.0 with Virtual Telephone does infringe the '639 patent, it is not necessary to engage in this analysis since the evidence of noninfringement is clear.

**303.** Dx 166, Vidil Decl. ¶ 35; Dx 168, Katz Decl. ¶¶ 27–29.

**304.** Mr. Literati, the project manager for the McDonald's trial, testified that McDonald's employees were told to forward their office telephones to the MMCX server (Tr. (Literati) 1313–15 (unofficial)). Assuming that this configuration has corroborated to support a claim of invention, the worker using the virtual conference room would be perceived as being in the office (*id.*).

**305.** Therefore, whether the date of the invention of the '639 patent is considered to be November 15, 1995 or September 13, 1995 is not material to a resolution of this aspect of the validity defense.

**306.** *Gechter v. Davidson,* 116 F.3d 1454, 1457 (Fed.Cir.1997).

*anticipation, § 102(a)*

▮ Both Lucent and Data Race have moved for summary judgment on Lucent's affirmative defense that the '639 patent is invalid on the ground of anticipation. Anticipation occurs when every limitation of a claim appears identically in a single prior art reference.[306] Thus, a prior art reference anticipates a claim only if it is shown by clear and convincing evidence that the reference discloses, either expressly or inherently, every limitation of a patent claim.[307] "There must be no differences between the claimed invention and the reference disclosure, as viewed by a person of ordinary skill in the field of the invention." [308] Anticipation is a question of fact and renders claims—not necessarily patents—unenforceable. Lucent bears the burden of proving anticipation by clear and convincing evidence.[309] Nevertheless, anticipation may be disposed of on summary judgment if the record discloses no genuine issue of material fact in dispute.[310]

Lucent refers to several devices in arguing that the '639 patent was anticipated, including the Multitech System MultiMux 101 and 102; the MCK Extender; AT & T Telecommuter Module; the Freeman patent; the Moller patent; the Inglehart patent and the MMCX release 1.0.[311] However, Lucent's own expert, Dr. Weiss, admitted that "[t]here's no one prior piece

**307.** *Applied Med. Resources Corp. v. U.S. Surgical Corp.,* 147 F.3d 1374, 1378 (Fed.Cir. 1998).

**308.** *Scripps Clinic & Research Found. v. Genentech, Inc.,* 927 F.2d 1565, 1576 (Fed.Cir. 1991).

**309.** *Mahurkar,* 79 F.3d at 1576.

**310.** *General Electric. Co. v. Nintendo,* 179 F.3d 1350, 1352 (Fed.Cir.1999).

**311.** Defendant also cited as part of the prior art Teltone's OfficeLink, a single-user device that extended office PBX to a remote worker (Dx 101). Defendant submitted a prior art claims construction statement comparing the prior art to the claims of the '639 patent (docket no. 49).

of prior art that anticipates it [the '639 patent] dead on. There are a number that come very, very close; but my understanding of the word 'anticipate,' there are none that anticipate it directly." [312] The Court agrees.

The MultiMux 101 and 102, the MCK Extender and the AT & T Telecommuter module are each point-to-point multiplexers that simultaneously transmit voice and data [313] but do not route data and voice based on identification information as set forth in the claims of the patent in suit; [314] rather, once the remote worker is logged on, and irrespective of which user logs on, each remote worker is supplied the same voice and data connection. [315] The AT & T Telecommuter Module provides a dedicated point-to-point connection similar to the MultiMux and MCK Extender, but supports only voice transmission and not data. [316] Even if the MultiMux device, the MCK Extender and the AT & T Telecommuter module were used in connection with a PBX that had been manually set to "call forward," the devices still do not use "identification information" in routing both voice and data from a VPS to the remote worker so that users may be treated differently. [317]

The system described in the Freeman patent [318] also provides point-to-point multiplexing of voice and data but does not extend telephony features to the remote user. [319] Lucent's expert acknowledged that the Freeman patent "does not disclose all of the elements in the Data Race patent." [320]

**312.** Tr. 1529. Docket no. 110 at 33.

**313.** Witt testimony, Tr. 474–75.

**314.** Witt testimony, Tr. 429, 426–77; Px 107.

**315.** Witt testimony, Tr. 474–75; 487–88; 490–91; Weiss testimony, Tr. 1530–31. Dr. Weiss testified only that the MultiMux 101 and 102, Dx 11 and Dx 91, are "very close" to containing all the elements of the '639 patent (Tr. 1445–49); see also docket no. 110 at 32("several pieces of prior art ... come very close to meeting that definition" [of anticipation]). Defendant appears to acknowledge that the MCK Extender does not discuss the use of identification information to route voice and data (docket no. 73 at 36). Dr. Weiss testified that the MultiMux and the MCK Extender contain all the elements of claim 1 except for the last element, use of identification information to determine if a communication was intended for the remote user (Tr. 1547). Dr. Weiss further testified that the use of identification information in routing data in an IP network would have been understood by one with ordinary skill (Tr. 1506, 1508–09).

Defendant further argues that these devices "anticipate" because Mr. Witt testified in his deposition that point-to-point connections are the "simplest form of routing" (docket no. 111 at 124). Mr. Witt's opinion on "routing," however, does not supersede the Court's decision on claim construction of the term "routing" for the '639 patent. See also Witt testimony, Tr. 55 (if a router were connected to the MCK Extender, the router would route). As part of the prior art, on November 5, 1995 MultiTech announced the addition of routing to the MultiMux device (Dx 154). Specifical-ly, a router could be added to route data, but not voice.

**316.** Witt testimony, Tr. 4490–91. The AT & T Telecommuter Module is virtually identical to the Teltone OfficeLink which was disclosed to the USPTO during the prosecution of the '639 patent and which did not bar issuance of the patent in suit. Unlike the Teltone disclosure, which showed the remote user connecting to the server through the PBX, the AT & T Telecommuter module connects directly to the server (Dx 175, Weiss Decl. ¶¶ 58–60).

**317.** Witt testimony, Tr. 1648–54; see also Witt testimony, Tr. 1535, 1542–44. Weiss testified that if a standard feature of PBX's, call forwarding and remote call forwarding, were used with the devices, this claim requirement and "virtual presence" would be met. But, the call forwarding feature of many PBXs is not mentioned or suggested in references. Defendant argues that the inability of the MCK and MultiTech devices to support multiple users and the need to administer manually the PBX to forward calls are not relevant distinctions under the '639 patent (docket no. 111 at 128 n.29).

**318.** U.S. patent no. 5,428,608; Px 106.

**319.** Witt testimony, Tr. 471–72; Weiss testimony, Tr. 1438.

**320.** Dx175, Weiss Decl. at ¶ 33–34. Defendant argues that other pieces of prior art teach how to extend office telephony to the remote worker (id. at ¶ 35; docket no. 73 at 37).

The Inglehart patent[321] discloses a telephony extension that does not satisfy "virtual presence."[322] Defendant appears to concede that the Inglehart patent does not disclose the routing of data to a remote user based on identification information, although it discloses access to the office computer system by the remote worker.[323]

The system described in the Moller patent[324] is a point-to-point multiplexer of voice and data. As with the Inglehart patent, the Moller patent does not teach the use of identification information to route voice and data from a VPS to a remote user.[325]

The Apple Computer, Inc.'s remote access personal server does not operate as an extension of the PBX and, thus, does not deliver "virtual presence" with respect to voice nor does it use identification information to route voice from a VPS to the remote worker.[326]

As noted herein, the MMCX with the Virtual Telephone application does not infringe the '639 patent. Accordingly, the MMCX release 1.0 does not infringe that patent.

Therefore, it is not "plainly evident" that any of the prior art references relied upon by Lucent disclose all the elements of the claimed invention. The principle of inherency[327] does not compel a different result.

*obviousness, § 103*

Lucent moves for summary judgment arguing that even if the '639 patent is not anticipated by a single reference in the prior art, all of the elements of the '639 patent were known in the art and it would have been obvious to a person of ordinary skill in the art at the time of the claimed invention combine prior art references. Lucent argues that the prior art renders the invention claimed in claims 1, 14 and 39 obvious, to include the MultiMux device; the MCK Extender; AT & T Telecommuter module; the Freeman patent; the Inglehart patent; the Moller patent; and MMCX release 1.0.

To establish that an invention is "obvious," the challenger may refer to a combination of prior art references provided that "something [exists] in the prior art as a whole to suggest the desirability, and thus the obviousness, of making the combination."[328] Thus, some prior art reference must teach the same combination applied by plaintiff or, if some combination of prior art references would suggest the invention at issue, such combination must exist as cognizable to a person of ordinary skill in the art. In determining obviousness, the Court must consider the invention as a whole without the benefit of hindsight.[329] An obviousness determination is a question of law which depends on an analysis of four factors: (1) the scope and content of the prior art; (2) the differences between the prior art and the claims at issue; (3) the level of ordinary skill in the art;[330]

---

**321.** U.S. patent no. 5,452,347; Px 109.

**322.** Witt testimony, Tr. 486–87.

**323.** Docket no. 73 at 41.

**324.** U.K. application 2,287,610; Px 108.

**325.** Dx 175; Witt testimony, Tr. 483.

**326.** Docket no. 65, ex.1, Bradner rebuttal report at 6.

**327.** Under the principle of inherency, a piece of prior art may serve as an anticipation, even it is missing descriptive matter, if that descriptive matter is necessarily present in the element in the reference. *Continental Can Co., USA, Inc. v. Monsanto Co.,* 948 F.2d 1264, 1268–69 (Fed.Cir.1991). As noted above, the call forwarding feature of many

PBXs was not mentioned or suggested in the prior art.

**328.** *Lindemann Maschinenfabrik GMBH v. American Hoist & Derrick Co.,* 730 F.2d 1452, 1462 (Fed.Cir.1984). *See also In re Geiger,* 815 F.2d 686, 688 (Fed.Cir.1987) (requiring for obviousness by combination of prior art references, "some teaching, suggestion or incentive supporting the combination").

**329.** *Rockwell Int'l Corp. v. United States,* 147 F.3d 1358, 1364 (Fed.Cir.1998).

**330.** Mr. Bradner testified that a person of ordinary skill in the art has a "Bachelor of Science degree in electrical engineering, computer science or 3–5 years of recent experience in the field" (Tr. 677). Although Lucent proposed a slightly higher level of ordinary

and (4) any secondary evidence of non-obviousness.[331]

As noted in the discussions of prior invention and anticipation, although each of the individual pieces for creating the claimed invention may have been available in the prior art, none of the references relied upon by Lucent disclose routing of voice and data to a remote worker using "identification information" as specified in the patent in suit and/or the creation of create "virtual presence." Moreover, any secondary considerations [332] do not support a finding of obviousness.[333]

Alternatively, if the '639 patent is not anticipated by a single prior art reference, Lucent argues that all of the elements of the '639 patent were known in the art and it would have been obvious at the time the invention was made to combine the references. Specifically, Lucent argues that the following combinations of prior art render the invention claimed in claims 1, 14 and 39 obvious:

the Inglehart patent [334] and the Freeman patent [335] or the MultiTech Multi-Mux; [336]

the MCK Extender [337] and the Freeman patent or the Inglehart patent;

AT & T Telecommuter module [338] and the MCK Extender;

the MMCX release 1.0 and the MCK Extender or the MultiTech MultliMux.

The motivation to combine these references to create the invention disclosed in the '639 patent is not "plainly evident" in the record. As noted, the prior art does not disclose routing based on identification information or virtual presence.[339] Accordingly, the decision to combine is not "obvious."

### § 112

■ Data Race has moved for summary judgment on Lucent's defense that the '639 patent is invalid based on § 112. Whether a patent complies with the definiteness or enablement requirements of § 112 is a matter of law that may be properly disposed of the a court on summary judgment.[340] Based on the reasons summarized below, the record does not show that the invalidity of the patent based on the § 112 defenses is "plainly evident."

In sum, in light of the prior art solutions to simultaneous access to voice and data

---

skill, Lucent "concedes that for the purposes of this decision, the Court may use plaintiff's definition" (docket no. 111 at 96; *see also* docket no. 110 at 33).

**331.** *Graham v. John Deere Co.*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966); *Robotic Vision Systems, Inc. v. View Engineering, Inc.*, 189 F.3d 1370, 1377 (Fed.Cir.1999).

**332.** *United States Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1565 (Fed.Cir.), *cert. denied*, 522 U.S. 950, 118 S.Ct. 369, 139 L.Ed.2d 287 (1997). Although financial success of Be There! has not been demonstrated, Data Race's product received high accolades when it was first introduced (Barker testimony, Tr. 147, 159–60).

**333.** Plaintiff introduced an article appearing in "Forbes" magazine concerning Be There! published June 2, 1997 which included an industry analyst's prediction that "within two years all the big communications gear makers will move in on his [Dr. Barker's] little business. Data Race has patents pending on some of its multiplexing techniques, but there

are a lot of ways to skin this cat and he can't patent the idea of personal multiplexing" (Px 123 at DR065023).

**334.** Dx 14.

**335.** Dx 12.

**336.** Dx 11 and 154.

**337.** Dx 13.

**338.** Dx 17.

**339.** The Virtual Networks article suggests that features in the prior art could be combined but, as defendant acknowledges, the article does not discuss simultaneous access to voice and data; the operation of a VPS as an extension of a PBX and LAN; or transparent working conditions (docket no. 73 at 41).

**340.** *Credle v. Bond*, 25 F.3d 1566, 1576 (Fed. Cir.1994); *see also Enzo Biochem, Inc. v. Calgene, Inc.*, 188 F.3d 1362, 1375 (Fed.Cir. 1999).

disclosed in the prior art references, based on defendant's evidence of obviousness and plaintiff's evidence to the contrary, the Court cannot conclude that it is plainly evident that all the claims disclosed in the '639 patent would have been obvious to those persons with ordinary skill in the art of multiplexing voice and data.

### § 112, ¶ 1 (Enablement)

The enablement requirement of § 112, ¶ 1 requires that the specification adequately disclose to one skilled in the relevant art how to make or use the claimed invention without unnecessary experimentation.[341] In opposition to summary judgment, Lucent argues that the asserted claims fail to enable the scope of the claims by failing to describe: how "identification information" is used to direct data communications from the LAN to the remote worker; how the VPS can reconnect a broken connection with the user communications device; and how, in claim 39, the user communications device can operate as an extension of the telephony server or a node on the LAN since the VPS is not "connected" to the telephony server or to the LAN.[342]

Although the claims and the specification do not set forth the details of how "identification information" may be used to route data, there is a disclosure of sufficient information to allow a person with ordinary skill in the art to recognize that in an internet protocol data network, an IP address would be a source of identification information along with a log-in id and security password and routing of information between connected circuits.[343] A person with ordinary skill in the art is able to determine what is claimed in the patent. The specification also provides an adequate description to enable the user communications device to operate as an extension of a PBX or a node on a LAN as provided in claim 39. It would be clear to one of ordinary skill in the art in light of the specification that the VPS must be "connected" to the network to function as described.[344]

### § 112, ¶ 2 (Definiteness)

In order to satisfy the requirements of § 112, ¶ 2, a claim must be sufficiently definite to "particularly point out and distinctly claim the subject matter which the applicant regards as the invention." The definiteness requirement exists to apprize those of ordinary skill in the art of the scope of the invention,[345] not to teach how to practice the invention.[346]

Lucent argues that the asserted claims of the '639 patent are invalid for indefiniteness because: claims 1 and 14 fail to recite: how "identification information" routes voice and data to the remote user; and how, in claim 39, the user communications device can operate as an extension of the telephony server or a node on the LAN since the VPS is not "connected" to the telephony server or to the LAN.[347]

Lucent's expert, Dr. Weiss testified that a person of ordinary skill would understand how "identification information" is used to route data.[348] The claims, read in light of the specification and read by a person of ordinary skill in the art, provide sufficient definiteness regarding the subject matter claimed as the invention.[349]

**341.** *Genentech, Inc. v. Novo Nordisk, A/S*, 108 F.3d 1361, 1365 (Fed.Cir.1997).

**342.** Docket no. 73 at 46.

**343.** Bradner testimony, Tr. 690–93; Weiss testimony, Tr. 1399–1409, 1508; Witt testimony, Tr. 571, 573.

**344.** *E.g.*, Bradner testimony, Tr. 548.

**345.** *Amgen, Inc. v. Chugai Pharmaceutical Co., Ltd.*, 927 F.2d 1200, 1217 (Fed.Cir.1991).

**346.** *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565, 1575 (Fed.Cir.1986).

**347.** Docket no. 73 at 47–48.

**348.** Weiss testimony, Tr. 1506, 1508–09.

**349.** *In re Moore*, 58 C.C.P.A. 1042, 439 F.2d 1232, 1235 (CCPA 1971).

*invalidity of apparatus claims 1 and 14*

Lucent has moved for summary judgment arguing that claims 1 and 14 are invalid because they are improperly stated as apparatus claims rather than method claims. Lucent argues that new uses for old products must be state as method claims. Data Race argues that this argument must be rejected because virtually all inventions—whether stated in method claims or apparatus claims—are combinations of old elements.[350] Because the record does not show that every element of the '639 patent is found in the prior art, this defense is not "plainly evident."

## 2. Inequitable Conduct

Lucent has moved for summary judgment on its defense that the '639 patent is unenforceable due to inequitable conduct before the USPTO. Lucent argues that Data Race committed inequitable conduct by intentionally withholding information relating to three pieces of prior art: the MultiTech MultiMux 101 and 102, the MCK Extender and a configuration of the Teltone OfficeLink.[351]

 Inequitable conduct before the USPTO is a defense to infringement.[352] Proof of this defense is submitted to the Court rather than a jury[353] and, if established, renders all the claims of the asserted patent unenforceable for the life of the patent.[354] The elements of the defense must be proved by clear and convincing evidence.[355] Inequitable conduct includes submitting false information, misleading information, misrepresenting information and not disclosing information.[356] Inequitable conduct must be both material and intended.[357] If the threshold levels of materiality and intent are met, the court balances the actual level of materiality and the actual level of intent and determines, as a matter of equity, if inequitable conduct before the USPTO has occurred.[358]

The evidence shows that Dr. Barker had information in his Data Race files that described the MultiTech MultiMux MMV 102[359] and that Dr. Barker possessed a product brochure from Teltone,[360] neither of which was submitted to the USPTO. Further, it is undisputed that Mr. Witt and others at Data Race knew that the MCK Extender was in existence before 1995,[361] and there is reason to agree with Lucent that Data Race easily could have confirmed that the MCK Extender was available on the market before the '639 patent issued such that information about the product should have been disclosed to the USPTO. The MCK Extender was relevant because, unlike the Teltone configuration distinguished by the patent examiner, it showed a direct connection from the remote user to the intermediate device,

**350.** Docket no. 114 at 7–8. *In re Rouffet,* 149 F.3d 1350, 1357 (Fed.Cir.1998); *Environmental Designs, Ltd. v. Union Oil, Co.,* 713 F.2d 693, 698 (Fed.Cir.1983).

**351.** Docket no. 110 at 51.

**352.** *J.P. Stevens & Co. v. Lex Tex Ltd.,* 747 F.2d 1553 (Fed.Cir.1984), *cert. denied,* 474 U.S. 822, 106 S.Ct. 73, 88 L.Ed.2d 60 (1985); Robert J. Goldman, "Evolution of the Inequitable Conduct Defense in Patent Litigation," 7 Harvard J.L. & Tech. 37 (1993).

**353.** *Paragon Podiatry Lab. v. KLM Lab.,* 984 F.2d 1182, 1190 (Fed.Cir.1993). Data Race acknowledges that inequitable conduct may be resolved by the Court and, therefore, notes that a ruling would be more properly styled "judgment" under Fed.R.Civ.P. 58 rather than "summary judgment" (docket no. 108 at 2; 22).

**354.** *Kingsdown Medical Consultants v. Hollister, Inc.,* 863 F.2d 867, 877 (Fed.Cir.1988) (en banc), *cert. denied,* 490 U.S. 1067, 109 S.Ct. 2068, 104 L.Ed.2d 633 (1989); *J.P. Stevens & Co.,* 747 F.2d at 1560–62.

**355.** *Kingsdown Medical Consultants,* 863 F.2d at 872.

**356.** *J.P. Stevens & Co.,* 747 F.2d at 1559.

**357.** *Baxter Intern., Inc. v. McGaw, Inc.,* 149 F.3d 1321, 1327 (Fed.Cir.1998).

**358.** *Id.*

**359.** Barker testimony, Tr. 249.

**360.** Dx 128; Barker testimony, Tr. 131.

**361.** Witt testimony, Tr. 446, 497, 514; docket no. 114 at 8–9.

similar to the VPS.[362] The Teltone brochure discloses the same product disclosed in the Teltone brochure that was provided to the USPTO during the prosecution of the '639 patent.[363] Data Race failed to submit information relating to an alternate configuration of the Teltone device which likely was material to the manner in which the examiner ultimately distinguished Teltone OfficeLink from the '639 patent.[364] Dr. Barker testified that he did not know of the alternate configuration of the Teltone device.[365] Mr. Witt testified that he did not know of the contents of all of the files in his office.[366] The MCK Extender was cited to the USPTO in Data Race's continuation application to the '639 patent.[367]

Although each of the references not disclosed to the USPTO is material, there is insufficient evidence that Data Race or the inventors of the '639 patent knew of the materiality.[368] The Court finds that Lucent has not presented sufficient evidence to render as "plainly evident" the unenforceablity of the patent in suit.

## VI. CONCLUSION

In sum, plaintiff's motion for a preliminary injunction[369] is **DENIED** on the ground that plaintiff has not sustained its burden of establishing its entitlement to preliminary injunctive relief pending the disposition of the merits of the case. Defendant's motion to strike the rebuttal testimony of Kenneth L. Witt in its entirety, which had been carried with the case, is **DENIED** except that the Court does strike and will not consider plaintiff's exhibits 144 through 150 to which Mr. Witt referred in his rebuttal testimony. The portion of defendant's reply[370] that requests that the declaration of Walter Bratic submitted by plaintiff in opposition to defendant's motion for summary judgment[371] be stricken is **GRANTED** and Mr. Bratic's declaration will not be considered. That portion of defendant's reply[372] that requests that a supplemental declaration of Scott Bradner in opposition to summary judgment[373] be stricken is **DENIED**. The portion of defendant's motion for summary judgment that requests entry of summary judgment on damages[374] is **GRANTED**. Therefore, the Court reconsiders its ruling on Lucent's motion to consolidate the preliminary injunction hearing with the trial on the merits. Lucent's oral motion for consolidation and renewed request for consolidation under Fed.R.Civ.P. 65(a)(2)[375] are **GRANTED**. Lucent's motion to dismiss without prejudice its counterclaim for declaratory judgment[376] is **GRANTED**. Defendant's motion for partial findings pursuant to Rule 52, Fed.R.Civ.P., which had been carried with the case, is **GRANTED**. The Court directs entry of judgment in favor of defendant on the

362. Dx 2 at 4.

363. Px 69.

364. Dx 2 at 4.

365. Tr. 215–16.

366. In explanation of his lack of familiarity with his own files, Mr. Witt testified that information regarding the MCK Extender was found in the files of Bill Davis which were moved to Witt's office after Mr. Davis passed away (Tr. 503, 518).

367. Witt testimony, Tr. 498. The Court further rejects the argument that Mr. Witt made a false statement in the information disclosure statement submitted in the continuation application which would render the '639 patent unenforceable under the doctrine of "in-

fectious unenforceability." *Baxter Int'l v. McGaw, Inc.,* 149 F.3d 1321 (Fed.Cir.1998).

368. *FMC Corp. v. The Manitowoc Co.,* 835 F.2d 1411, 1415 n. 7 (Fed.Cir.1987).

369. Docket no. 64.

370. Docket no. 113 at 12, 20.

371. Docket no. 108, ex. 2.

372. Docket no. 113 at 8, 20.

373. Docket no. 108, ex. 1.

374. Docket nos. 100 and 110.

375. Docket no. 110 at 64 n.40.

376. Docket no. 110 at 64 n.39.

issue of infringement based on the findings and conclusions in this Order. In the alternative, and to the extent that there are no genuine issues of material fact, the Court grants the portion of defendant's motion for summary judgment that requests summary judgment on infringement.[377] Because Virtual Telephone does not infringe the '639 patent, plaintiff is not entitled to final injunctive relief, to include injunctive corrective advertising. The remaining portions of defendant's motion for summary judgment[378] and plaintiff's motion for partial summary judgment[379] on defendant's affirmative defenses are **DENIED** as moot; Data Race has not prevailed on its case that Virtual Telephone infringes the '639 patent and Lucent has not established that invalidity or unenforceability of the '639 patent is "plainly evident." Judgment shall be entered in favor of defendant.

**IT IS SO ORDERED.**

---

**377.** Docket nos. 100 and 110. A Court need not enter findings of fact and conclusions of law when summary judgment is entered. *Petersen Mfg. Co. v. Central Purchasing, Inc.,* 740 F.2d 1541 (Fed.Cir.1984).

**378.** Docket nos. 100 and 110.

**379.** Docket no. 102.